BREDIN et al. v. NATIONAL METAL WEATHER STRIP CO.

(Circuit Court, W. D. Pennsylvania. November 9, 1910.)

No. 39, November Term, 1904.

1. PATENTS (§ 318*)—INFRINGEMENT—ACCOUNTING—MANUFACTURER'S PROFITS.

The owners of a patent for a weather strip, by granting to agents exclusive licenses to use such strips in the equipment of windows in buildings in certain territory, reserving the right to manufacture and sell in such territory for other purposes, did not part with the right to recover the manufacturer's profit made by an infringer who made and sold the infringing strips in such territory.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 567; Dec. Dig. § 318.*

Accounting by infringer for profits, see note to Brickill v. Mayor, etc., of City of New York, 50 C. C. A. 8.]

2. PATENTS (§ 318*)—SUIT FOR INFRINGEMENT—ACCOUNTING—PROFITS RECOVERABLE—EXCLUSIVE LICENSEES—PRACTICE—PARTIES.

Where a part owner of a patent, who was also an exclusive licensee for the sale and use of the patented article in certain territory, joined with his co-owners in a bill for infringement, on a decree sustaining the patent, finding infringement and directing an accounting, complainants are entitled to recover on such accounting all the profits made by defendant by the sale of the infringing article in such territory, those inuring to the licensee as well as to the owners of the patent, although the licensee is not formally joined in such capacity and no claim in his behalf as licensee is specifically made in the bill, a general prayer for an accounting being sufficient.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 567; Dec. Dig. § 318.*]

3. PATENTS (§ 319*)—SUIT FOR INFRINGEMENT—ACCOUNTING—DAMAGES—SALES TO LICENSEES—TREBLE DAMAGES.

Where complainants, who were owners of a patent and manufacturers of the patented article, granted exclusive licenses for certain territory to use the patented article, the licensees binding themselves to buy from them only, and defendant solicited from such licensees orders for, and sold to them, an infringing article, complainants are entitled to recover as damages for the infringement, in addition to the profits made by defendant on such sales, the difference between such profits and the profits complainants would have made if the licensees had purchased from them; and, where it appears that defendant made false representations to effect the sales and induce the licensees to break their contracts, treble damages should be awarded.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 581, 582; Dec. Dig. § 319.*]

4. PATENTS (§ 319*)—SUIT FOR INFRINGEMENT—ACCOUNTING—DAMAGES FOR SALES LOST—EVIDENCE OF.

In a suit for infringement of a pioneer patent for an article of a particular type, where complainants were the sole manufacturers, and the infringer who had been their agent and had the advantage of knowing their trade closely imitated the patented article and sold at a reduced price, and was their only competitor in the sale of such type, it is fair to assume that in all probability complainants would have made the sales made by defendant but for the infringement, and they are entitled to recover as damages the difference between the profits made by defendants on its sales and the profits which complainants would have made on the same.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 580; Dec. Dig. § 319.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by James Bredin and others against the National Metal Weather Strip Company. On exceptions to report of master appointed to state an account. Exceptions sustained.

For opinions sustaining the patent in the Fourth Circuit, see Bredin v. Solmson (C. C.) 132 Fed. 161, affirmed 136 Fed. 187, 69 C. C. A. 203; and in the Third Circuit, see Bredin v. National Weather Strip Company (C. C.) 147 Fed. 741, affirmed 157 Fed. 1003, 85 C. C. A. 281. Also see opinion on accounting in Fourth Circuit, Bredin v. Solmson (C. C.) 145 Fed. 944.

The decree having been entered for an accounting, the case was referred, for that purpose, to W. S. Dalzell, Esq., as master, who reported as follows:

To the Honorable, the Judges of Said Court:

Having been appointed master pro hac vice "to ascertain, take, state and report to the court an account per foot of weather strip containing the said patented improvement, made and sold by it, the defendant, and also the gains, profits and advantages which it, the said defendant, has received or which have arisen or accrued to it from the infringement of the exclusive rights of the complainants by the manufacture and sale of the said invention and improvements secured by the second and third claims of the said letters patent No. 424,905, and also an account of the damages suffered by the complainants by reason of the defendant's infringement of the said second and third claims of the said letters patent," I do respectfully report:

The first hearing was held according to due notice at my office in the city of Pittsburg, Pa., on the 11th day of March, 1908, and at various dates thereafter to which adjournments were duly taken. At all of these hearings there were present the respective solicitors for the complainants and defendant, and the defendant's principal officer appeared with all books and other records which he had for the purpose of enabling him to properly comply with your order. The accounting grows out of decisions in two separate cases, which involved the patent referred to in the above decree appointing me as master. The question as to the validity of the patent was first raised before the Circuit Court for the District of Maryland, Fourth Circuit, in the case of Bredin et al. v. Solmson, and reported in 132 Fed. 161, and that decision was sustained by the Circuit Court of Appeals for the Fourth Circuit, and is reported in 136 Fed. 187, 69 C. C. A. 203. The case now directly before us was heard and decided by the Honorable R. W. Archbald, specially presiding, and is reported in 147 Fed. 741, and that decision was affirmed by the Circuit Court of Appeals for the Third Circuit, and is reported in 157 Fed. 1003, 85 C. C. A. 281.

The complainants ask that they be allowed: (1) Profits made by the defendant through the manufacture and sale of the infringing metal weather strip, (2) damages suffered by the complainants, and (3) exemplary damages, authorized by the federal statutes. In his brief, complainants' counsel says: "At the outset we would state that it will not be contended that the complainant is entitled to profits made by the defendant by the sale of the infringing material, and also the damages caused the complainant by the infringement;" so that it will be understood that this accounting is made with that in view.

It is contended that there are two separate claimants, namely: The complainants as owners of the patent infringed, and the legal representative of the estate of James Bredin, deceased, as licensee of the territory contained within the western portion of the state of Pennsylvania.

### Facts.

The complainants having acquired title to the patent in question, known as the Sims patent, began in the year 1897 to manufacture and sell the weather strip covered by said patent. The business was conducted through a corporation known as the Chamberlin Metal Weather Strip Company of Detroit, Mich. That company manufactured the weather strip and sold it to various agents or licensees located in the larger cities of the country. These licensees were,

under written contracts, given the sole right to sell the weather strip within prescribed areas, and as I understand it, in some, if not in all, cases the company received from such licensees a prescribed price for the privilege of selling the weather strip. The weather strip was sold to these licensees at a fixed price, and they had the right to sell it at such price within their respective districts as to them might seem proper. Among these licensees was James Bredin, one of the original complainants, and now deceased. He held a license for a territory not specifically described to me, but consisting for all practical purposes of the western half of the state of Pennsylvania. For some time prior to 1901, a gentleman by the name of S. P. Bricker, located in the city of Allegheny, Pa., from time to time purchased varying quantities of the Chamberlin strip for his own business. In June, 1901, Mr. Bricker having had incorporated a company under the laws of the state of Pennsylvania, known as the National Metal Weather Strip Company, began to do business with a principal office in the city of Allegheny, Pa. During his dealings with the Chamberlin Weather Strip Company, he became acquainted to a greater or less extent with the manner in which the Chamberlin Weather Strip Company conducted its business, and also knew to a greater or less extent where its licensees were located. Mr. Bricker began as soon as possible to compete with the Chamberlin Weather Strip Company wherever such could be done. At that time the Chamberlin Company had licensees in something like 20 different cities, and the National Metal Weather Strip Company endeavored to place a representative of its own in each of those places. There is no doubt from the testimony that the Chamberlin Weather Strip Company knew of the existence of the National Metal Weather Strip Company almost as soon as it began to do business. Mr. Bredin, in addition to being a licensee and located in Pittsburg, was one of the owners of the patent, and therefore largely interested in the Chamberlin Weather Strip Company. A reference to the letters offered in evidence by the Chamberlin Weather Strip Company, and set forth at length in the record of the Maryland case, will show that the Chamberlin Company was importuned continually by, if not all, at least a very large part of its licensees to protect them from the competition of the National Metal Weather Strip Company. These letters prove how intense the competition was between the respective parties, and yet the Chamberlin Company seems to have been so well satisfied with the progress it was making in building up a trade and selling its product that it did not make a move to restrain the defendant from an infringement of its patent rights, until September, 1904, a period of three years and three months after the defendant had gone into the business. As to just why the complainants, with the knowledge they had of the then claimed infringement of the complainants' patent, should have first filed a bill in equity in Maryland against a mere agent of the defendant is not explained. The final decree in the suit against the National Metal Weather Strip Company was entered March 8, 1905, so that the accounting period extends from June, 1901, to March 8, 1905.

### Findings.

First. I find that the total amount of weather strip, both "National" and "Columbia," manufactured and sold by the defendant during the accounting period was 908,258⅙ feet. Of this total amount 65,566 feet consisted of the "Columbia" strip. In the Pittsburg district, owned by James Bredin as licensee, there were manufactured and sold 295,065 feet. Within the Pittsburg district there were equipped 6,389 windows. The defendant sold direct to the agent or licensee of the complainants as follows: To Rooseler, Cleveland, 55,-134⅔ feet; to Chamberlin Weather Strip Company at Baltimore, 1,002 feet.

Second. I find the defendant's manufacturer's profit to have been 1 cent per foot, and the profit for equipping windows to have been 19 cents per window.

Third. I find that the complainants have failed to prove any damages, and I therefore should award them nominal damages.

Fourth. Under the facts and circumstances of the case, I find no justifiable reason for increasing the damages, as claimed by the complainants.

There seems to be no dispute as to the figures pertaining to the amount of weather strip manufactured and sold during the accounting period, nor as to any other data comprehended under my first finding. These figures were ob-

tained from the books and other records of the defendant company, and were thoroughly gone over on cross-examination of Mr. Bricker by complainants' counsel. There was no evidence to controvert them.

With respect to the finding of 1 cent as manufacturer's profit, I have, after a careful consideration of all the testimony upon that point, come to the conclusion that that is the proper figure. Mr. Bricker at the outstart placed it at about 1 cent a foot, but subsequently fixed it at ¾ cent per foot. I am not satisfied that the complainants offered any evidence which would persuade me that Mr. Bricker's estimate of ¾ cent was inaccurate; but upon a careful consideration of Mr. Bricker's testimony I am of the opinion that while he was perfectly frank and reliable throughout his testimony before me, he arrived at his conclusion upon a basis which cannot upon settled principles be permitted. He gave such testimony as the following:

"Q. 16. You have testified in your direct examination that as near as you could tell you thought the profit amounted to about three-fourths of a cent a foot on the National strip. Have you any reason to change that estimate? A. At the time I gave that estimate, I thought it about correct; but I have reasons now for changing it, for the reason that during the entire accounting period we sold approximately eleven hundred thousand feet, and all that we secured from that as stockholders was $1,600 in dividends and the cost of this litigation up to that time of $3,360.23 and $40 to Mr. Conner, as an expert. Figuring that up, we find that at the expiration of the accounting period there was left a deficit of $420. This left a balance of $4,580.23, which were our profits on eleven hundred thousand feet of strip. Therefore, it would have been impossible for us to have made three-fourths of a cent on National strip. Q. 17. You say there was a deficit at the end of the accounting period. What do you mean by that? A. I mean to say that at the end of the accounting period we had overdrawn $420. We had paid out $420 more than we had received. Q. 18. Figuring the amount which you paid in dividends during the continuance of the company up until the 8th of March, 1905, and such other items as you have given, what would they represent per foot in the way of profit on all the strip that you manufactured and sold? A. A little better than four-tenths of a cent per foot."

It would seem apparent that to permit an estimate of manufacturer's profit to be fixed upon the basis of dividends paid stockholders would be most unreliable. The principal owners of a business under such a system of computation could show no profit whatever, if they saw fit to vote to themselves large salaries as officers of the company. And again, it would seem that the defendant has no right to take into consideration in figuring his manufacturer's profit the cost of the litigation. Upon a careful consideration of the testimony offered on this subject, I am therefore of the opinion that 1 cent per foot is about as near the true profit made by the defendant as can be arrived at.

The profit of 19 cents for equipping windows is that given by Mr. Bricker, and while the complainants offered evidence to show how they could make a profit of 40 cents per window, counsel did not show to my satisfaction that Mr. Bricker's figures were too low.

With respect to damages to complainants, I find no evidence. Mr. Charles H. Bredin, one of the complainants, testified in a deposition taken at Detroit in January, 1909, that the dividends of the Chamberlin Company during the accounting period were satisfactory, and he gave no testimony whatever with respect to the company having been damaged. And how could he, if, as he said, dividends were satisfactory during the period in question? The complainants introduced a great deal of testimony which would seem to be of no value in arriving at a conclusion with respect to damages. Testimony with regard to advertising and other acts upon the part of the defendant in competing for business in various parts of the country is, in my opinion, irrelevant, because (1) such acts were aimed at the interests, not of complainants, but of their licensees, who in themselves owned the exclusive right of sale of complainants' strip within their respective territories; (2) such testimony contains no figures from which to base a calculation; and (3) the testimony is undisputed that there were a number of other strips in the market in competition with both complainants' and defendant's product, notably the strip known as the "Golden" strip. Mr. Golden, in a deposition taken on behalf of

the defendant in Detroit in January, 1909, testified that he had been in the business of manufacturing metal weather strips for a period of nine years, and that he had repeatedly come into competition with the Chamberlin strip during that time, which would cover the accounting period. For instance, some idea as to the amount of business done by the Golden Company can be gained from the testimony of Mr. Golden to the effect that during the accounting period he sold from 824,495 feet to 1,447,194 feet. It is contended by complainants' counsel that evidence of the existence of the Golden metal weather strip and the various others named in the testimony is irrelevant, because the other strips were duly patented and were therefore in the market by right. It seems to me that evidence of competition has a direct bearing, in that it shows the practical impossibility of conclusively, or even reasonably, proving the amount of damage the complainants may have suffered by reason of competition of the infringing strip. In other words, it is impossible to say how much of the business would have gone to the Chamberlin Weather Strip Company, if the infringing strip had not been in the market, for the reason that the personality of agents, their standing in the community, and various other things have much to do with their success in selling a given article upon the market. And if the National metal weather strip had not been in the market, it does not necessarily follow that the Golden or some other strip would not have obtained the business or a great portion thereof from the Chamberlin agents.

For the foregoing reasons, and for the further reason that complainants have not given me any figures in the various territories throughout the United States upon which to base an accounting, I am unable to find that the companies have suffered any damages whatever. Complainants will doubtless contend that even though my conclusion just given be sound, they are, nevertheless, entitled at least to damages upon the amount of strip sold by the defendant direct to complainants' licensees, the amount of which I have duly found. But are they? For aught that appears in the testimony, these licensees may have purchased from the defendant because they could not get the strip promptly enough for their purposes from the complainants; or perhaps because on those particular occasions purchases were made owing to the licensees themselves preferring the defendant's strip. It would have been an easy matter for complainants to have called the licensees to whom the shipments were made and had them testify that if they had not purchased from the defendant they would have purchased from the complainants. This they failed to do, and on the face of the record I am of the opinion that I am not at liberty to guess that those sales resulted in a loss to the complainants.

And now, a word as to the right of James Bredin to recover damages as licensee: That James Bredin as licensee must have suffered a loss of profits by reason of the defendant's competition in the western portion of Pennsylvania would seem to admit of no doubt. But is he entitled to recover under the pleadings in this case? By a reference to the bill of complaint, it will be seen that James Bredin sues along with his partners as an owner of the patent. He is not formally joined as licensee, and at no place in the bill is such independent right in himself set up. After reciting the manner in which the complainants jointly acquired title to the patent, they aver in paragraph 8 of the bill: "And your orators further show that they fear, and have reason to fear, that unless the defendant, the said National Metal Weather Strip Company, be restrained by a writ of injunction issuing out of this court, it (the defendant) will continue to practice and make, sell and use the invention of your orators, and will make and sell the weather strip made in accordance and covered by the said letters patent, and to deprive your orators still further of their gains, profits and advantages which would otherwise accrue to them. Therefore, your orators pray that the said defendant, the National Metal Weather Strip Company, be specifically compelled by a decree of this Honorable Court to account for and pay over to your orators all such gains and profits and the value of such advantages as have accrued to it, the defendant, by reason of the infringement herein complained of, and all such gains and profits as would otherwise accrue to your orators and the damages sustained by them by reason of said infringement, and that because

of the willful nature of the infringement the damages be increased three fold, and that the defendant be compelled to deliver to your orators all devices or parts of devices, pertaining or made in accordance with the said letters patent, or substantially in accordance therewith, which are directly or indirectly in the possession of the said defendant."

The bill will be searched in vain for any reference to James Bredin as licensee, or as to any rights in him growing out of the sale of the infringing article in derogation of his rights within a specified district.

The complainants' counsel in his brief threw in, apparently as an after-thought, a claim for an accounting on behalf of James Bredin as licensee, but subsequently made no further reference thereto nor argument thereon, except a mere casual reference to the claim on the last page of his brief. I am of the opinion that if James Bredin intended to demand a separate accounting in his own behalf as licensee, he was bound to join in that capacity as a party complainant, and to set forth the grounds upon which he claimed such right. Not having done so, the defendant has had no notice of such claim, and cannot be held bound by evidence with relation thereto.

To summarize, the result of my findings as to profits, is as follows:

| | |
|---|---|
| Defendant's manufacturer's profit at 1 cent on 908,258⅙ feet...... | $9,082.58 |
| Defendant's manufacturer's profit at 1 cent on 295,065 feet in Pittsburg district.............................................. | 2,950.65 |
| Complainant's manufacturer's profit at 1½ cents on 55,134⅔ feet of weather strip sold by defendant to Rooseter................... | 825.01 |
| Complainants' manufacturer's profit at 1½ cents on 1,002 feet of weather strip sold by defendant to Chamberlin Weather Strip Company at Baltimore........................................... | 15.03 |
| Defendant's profit on the equipment of 6,389 windows............. | 1,213.91 |

### Conclusions.

The rule with respect to profits is that where both the legal and equitable title to a patent are vested in the patentee or his assigns, the patentee may sue an infringer and recover all damages suffered by him as the result of the infringement. But if he has vested a license for a particular district or districts in a licensee or licensees, the patentee cannot recover for infringements of the licensee's rights, but must have the licensees join with him as parties plaintiff in the action. In such case, the patentee can recover only such damages as may have been suffered by him in his own right, any damages suffered by the licensees being payable to them. Bredin v. Solmson (C. C.) 145 Fed. 944; Birdsell v. Shaliol, 112 U. S. 485, 5 Sup. Ct. 244, 28 L. Ed. 768; Waterman v. Mackenzie, 138 U. S. 252, 11 Sup. Ct. 334, 34 L. Ed. 923; Blair v. Lippincott (C. C.) 52 Fed. 226. It would therefore follow that, as I have already pointed out, the complainants are not entitled to recover for damages suffered in the various territories in which there was competition by the defendant, because they have not joined in this action the licensees for such territories as co-complainants. Hence, under the above authorities no profits can be awarded to the complainants in this accounting.

If, then, the complainants are not entitled to defendant's profits, they are entitled to recover only such damages as they can prove they have suffered as the owners of the patent. That they have been damaged, and, if so, how much, I am unable to determine from the evidence. I find it impossible to reconcile the figures set forth in complainants' circulars, alleging largely increased equipments of widows, such increases and the figures therefor covering the total period from 1897 to and including the accounting period in 1905, and Mr. Bredin's statement as to "satisfactory dividends" during the accounting period on the one hand, with the vague, loose, and indefinite statements as to loss of business on the other. True, testimony was given with reference to the loss of business in the Pittsburg district, but the testimony was so vague, uncertain, and indefinite as to render it of little or no value, particularly, as I have said, when contradicted by circulars containing contrary information issued from time to time in this district. And the testimony given with respect to the business of the Chamberlin Weather Strip Company of Detroit is equally uncertain and unreliable. "Actual damages must be calculated, not

imagined; an arithmetical calculation cannot be made without certain data on which to make it." N. Y. v. Ransom, 23 How. 487, 16 L. Ed. 515; Cornely v. Marckwald, 131 U. S. 159, 9 Sup. Ct. 744, 33 L. Ed. 117; Boesch v. Graff, 133 U. S. 697, 10 Sup. Ct. 378, 33 L. Ed. 787.

I am therefore of the opinion that the complainants have failed to sustain the measure of proof imposed upon them by law, and would award them only nominal damages.

It follows from the authorities first above cited, as well as upon elementary principles of pleading, that James Bredin, having failed to join in his character of licensee as co-complainant, has forfeited his right to an accounting in this proceeding. Bredin as part owner of the patent and Bredin as licensee are two separate and distinct parties of record. The legal rights are totally different. The one can sue with his partners to restrain an infringement; the other cannot, without being joined by the patentees. It was incumbent, therefore, upon Mr. Bredin, not only to join as party complainant in his status as licensee, but also to affirmatively set forth his claim in the bill with the same particularity as his co-complainants set forth theirs, so that the defendant might have an opportunity to answer. He is, therefore, not entitled to an accounting in this proceeding.

In view of the decision of this court, however, the question of defendant's infringement is not an open one, and the mere fact that complainants have, in my opinion, failed to prove any damages to themselves ought not to free the defendant entirely from the consequences of its infringement. I therefore conclude that the costs of this account should be paid by the defendant.

L. S. Bacon, for exceptions.
Charles M. Clarke, for defendants.

ARCHBALD, District Judge (specially assigned). The complainants, according to the master, are entitled to nothing on this accounting, either by way of profits or damages, and must be content, as the result of the litigation, with the establishment of their patent, and the deterrent effect on others, for the time being, so secured. That profits were made by the respondents is not disputed, and there is evidence of damages as well. But for one reason or another the master has put both of them aside, and the question is whether they should not have been allowed.

In all cases where infringement is established, the infringing party is accountable in equity for the profits which he has made out of it. Where the owner of the patent has granted exclusive licenses, this accountability may be a divided one, the infringer being liable to the owner for a part, and to the licensees for another part, according as the profits from the infringement may have been taken from the one or the other. In the present instance, there are numerous exclusive licensees, and, according to the master, in order to entitle the complainants to any of the profits made by the respondents, the licensees should have been joined in the bill. But this is based on a misconception. The licensees, under their agency contracts, were entitled to the profits made on the equipment of buildings, but, except as to Mr. Bredin, this is not what is being proceeded for now. They had nothing to do, however, with the profits of manufacture, which belong to the complainants, as owners of the patent, and for these the respondents must account to the complainants, if they are accountable at all. The right to manufacture and sell for the equipment of windows elsewhere than in buildings, was expressly reserved to the complainants in the license agreements, and the

respondents, in manufacturing, having infringed on this right, the profits which they derived from it belong to the complainants, whose was the right so infringed. There is nothing to the contrary in Bredin v. Solmson (C. C.) 145 Fed. 944, assuming that it controls. The right to manufacturers' profits in that case was expressly disclaimed, the profits and damages outside of that being all that was sought, and the installation profits being all that were proved. These, of course, belonged to the licensee in whose territory they were obtained, and with whose trade they had interfered. And it was rightly held, in consequence, that the agent of the respondents, who was installing the infringing strips, was not liable to the complainants for the profits on installation sales which he had made. But that does not touch the question here. The liability to the complainants for manufacturers' profits was not involved, and, under the reserved right to manufacture and sell, that liability in the present instance is clear. The profits derived by the respondents, from the manufacture of the patented article, were in direct breach of the complainants' rights, as owners of the patent, and are regarded, in equity, as belonging to them, and are therefore properly brought into this account. During the period covered by the accounting, the respondents admittedly manufactured and sold 908,258 feet of infringing weather strips, at a manufacturer's profit, according to the master, of a cent a foot, making $9,082.58, to which extent, at least, they are liable to the complainants in this suit.

Profits on installation sales in Pittsburg are also claimed. This territory was let to Mr. James Bredin, one of the owners of the patent, and a complainant here. Being joined as a party, the condition deemed requisite by the master was apparently fulfilled. But the right to recover anything on his account was, nevertheless, denied, the master being of opinion that he ought to have been formally joined as licensee, and a claim on his behalf specifically made in the bill. But the bill proceeds primarily for the establishment of the patent, and the accounting follows as a consequence of its being sustained and infringement found. The decree, in conformity with this, is that the respondents account for the gains, profits, and advantages which have been so secured, which is broad enough to include those which belong to the complainants jointly, as well as those which are due to one of their number, by reason of the special relation which he has to the rest. A general prayer for an accounting is thus enough. The particular matters, as to which a recovery is sought, do not have to be set out, these being developed as the accounting proceeds. There may be reasons at times for bringing in a licensee, where anything is to be claimed on his behalf, so that the respondents may be advised of that fact. Brookfield v. Novelty Glass Manufacturing Company, 170 Fed. 960, 96 C. C. A. 127. But that does not apply here. The licensee is, himself, one of the complainants in the bill, and the rights peculiar to himself, which are sought to be enforced, are germane to the common end for which the bill was brought, of which the respondents have sufficient notice in the double relation which he sustains. Nor is it contended that they have been deprived, for want of it, of any

defense which they might otherwise have made; and the suggestion that they could be called to account for these profits in another bill is altogether unsound. Moreover, if it were essential, an amendment to meet the situation could be made and would be allowed. In the Pittsburg district, controlled by Mr. Bredin, 6,389 windows were equipped, and the profit per window was 19 cents, making $1,213.91, for which the respondents must therefore further account. The claim of 30 cents profit per window is refused.

Damages, in addition to profits, are also claimed, but, except as the one exceeds the other, it is not contended that the complainants are entitled to both. The only damages, not covered by the profits for which the respondents have already been held accountable, are the additional sums, if any, which the complainants would have made if the respondents had not been in the field. As already stated, 908,258 feet of infringing weather strips were sold by the respondents, and of these, by their direct solicitation, 71,643 feet were disposed of to the complainants' agents, 56,132 feet being what was known as Columbia strip, an exact duplication of the one in suit. The agents, to whom these sales were made, were under contract to buy exclusively of the complainants, and what they were thus persuaded to buy of the respondents, in breach of their contracts, took just that much from the sales which the complainants, beyond question, would otherwise have made. The complainants were therefore damaged by sales lost; and the profits which they would have made on them, at a cent and a half a foot, would amount to $1,074.51. But they have already been allowed a cent a foot, manufacturers' profits, on these sales, and are therefore only entitled to half a cent more, which makes the damages on this account $358.17. The infringement here, however, was of a flagrant character, and should not be passed by with this simple amount. Not content with the ordinary competition, the respondents sent around to complainants' agents the Columbia strip, which was identical in form with that which the complainants supplied, offering it at two cents a foot, where the complainants' agents were charged and had agreed to buy for three, representing that it was manufactured under a British patent, which had expired. This attempt to discredit the patent and undermine the complainants' rights, the agents being induced to break the contracts by which they were bound, so aggravated the infringement that treble damages should be allowed; and this item will therefore be increased to $1,074.51.

The right to damages, for the rest of the total number of feet sold, depends on whether, if the respondents had not sold it, the complainants would; as to which, in Pittsburg, at least, there can be little doubt. The complainants, through Mr. Bredin, had a monopoly of the field in that vicinity, when Mr. Bricker, the president of the respondent company, who had been Mr. Bredin's agent, started in to sell; and having the advantage of knowing the trade, it is fair to assume that the sales he made were taken out of those which the complainants, through Mr. Bredin, would otherwise have secured. These sales amounted to 295,065 feet, which, at half a cent a foot, the profits which the complainants would have made above that already allowed, makes $1,475.32, for which the respondents must also account.

But it is reasonably probable that the rest of the respondents' sales were also taken from those which the complainants, if not interfered with, would have made. The complainants were pioneers in the tongue and grove metal weather strip art, and were fully equipped at all times to supply the trade. It is true that there were other weather strips in vogue, but the complainants and respondents were the only two of this particular type, and were in direct competition throughout the entire field. The Golden strip was quite different, and competition with it not at all the same. There are, of course, elements in the problem which make it impossible to say, with absolute certainty, that what the one party got the other would have secured if left alone. But, having regard to the peculiar character and close similarity of the two devices in suit, and the fact that they were competing side by side, as well as the direct attack made by the respondents on the complainants' established trade, it is fair to assume that in all probability the complainants' loss comprised the respondents' gain, which is enough for our purpose here. Kinner v. Shepard (C. C.) 107 Fed. 952. The complainants are therefore entitled to half a cent on the rest of the whole amount sold.

Summing up the case, the respondents must accordingly account for:

1. Manufacturers' profits on 908,258 feet at 1 cent a foot.......... $9,082.58
2. Profits on installations in the Pittsburg district, of which James Bredin was licensee, 6,389 windows at 19 cents each.......... 1,213.91
3. Damages in excess of profits on sales to complainants' agents, 71,634 feet at half a cent a foot, $358.17, trebled on account of the aggravated character of the infringement................ 1,074.51
4. Damages in excess of profits in the Pittsburg district on 295,065 feet at half a cent a foot, which the complainants would otherwise have sold........................................ 1,475.32
5. Damages in excess of profits at the same rate on the rest of the weather strips sold by the respondents throughout the entire field ...................................................... 2,707.79

Total ............................................................ $15,554.11

Let a decree be entered in favor of the complainants for this amount.