**LIVESAY WINDOW COMPANY, Inc.,**
Appellant,

v.

**LIVESAY INDUSTRIES, Inc., and Ever-
ett G. Livesay Window Company,
Inc., Appellees.**

No. 16403.

United States Court of Appeals
Fifth Circuit.

Jan. 24, 1958.

Rehearing Denied March 19, 1958.

Walter Humkey, Miami, Fla., Ralph L. Chappell, New York City, Hollis Rine-

hart, Miami, Fla., Kenyon & Kenyon, New York City, Fowler, White, Gillen, Yancey & Humkey, Rinehart & Gibbs, Miami, Fla., of counsel, for appellant.

J. M. Flowers, Henry M. Sinclair, Miami, Fla., for appellees.

Before RIVES, TUTTLE and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Now back with us for the second time, Livesay Industries, Inc., v. Livesay Window Co., Inc., 5 Cir., 202 F.2d 378, after an extended trial before a Master whose findings were essentially adopted by the District Court, the questions[1] concern (1) the basis for ascertainment of the damages as allowed for infringement down to the date, October 8, 1951, of the final decree;[2] (2) the time notice of infringement was given, 35 U.S.C.A. § 287, to start the running of damages; and (3) the allowance of attorney's fees as an "exceptional case," 35 U.S.C.A. § 285.

The question of validity and infringement is no longer open. The patent, owned by the Patent Holder, and under exclusive license to the Licensee, covers a pre-cast, concrete monolithic window frame suitable for residential and commercial buildings. The specific characteristic of the window frame held to have resulted in infringement was the imbedded metal Venetian blind guide channel. The Infringer's window frame which has throughout been tagged as "Exhibit A frame," instead of imbedding the metal blind guide in the vertical side pieces in the process of casting, was cast with rel-

atively flat facing, but with metal pintles to which the metal channel blind guides were subsequently installed by nails or screws. When thus installed, the Infringer's blind guide was not flush with the face of the frame. The usual thing was for the surface of the face to be plastered, so that, on completion, the blind guide was, for all practical purposes, imbedded as in the patent. The Infringer's sales price included the cost of the frame and the subsequent installation of the metal blind guides on the pintles by an alleged independent contractor.

In developing a record which comprises over 1,250 printed pages and, by consent, includes the record from the 1952 contempt proceedings for some alleged post-decree infringements, the Master spent over 16 days in the hearings. His careful report[3] reflects, as did the initial one on infringement in the first appeal, the necessity for his having devoted an estimated 75 additional days to the preparation of the report.

In the hearings the Master saw and heard the numerous witnesses testify. They included outstanding and reputable builders, contractors and architects familiar with building construction in the greater Miami area in the years 1948–1951 as well as the Master-appointed Accountant and the two accountant experts appearing on opposite sides to evaluate and translate records into probable sales and profit and loss figures. While fought with all of the professional proprieties by the contending advocates, this record is mute evidence that nearly everything

---

1. As the similarity of corporate names only adds to the confusion, we refer to the plaintiffs below as the Patent Holder and the Licensee and to the defendant as the Infringer.

2. The District Court declined to allow any award for damages sustained subsequent to the entry of the permanent injunction contained in the final decree of October 8, 1951, see note 2, our former opinion 202 F.2d at page 380. The plaintiffs below, the Patent Holder and Licensee, have not appealed from that action. The Court stated that this should be determined in likely subsequent con-

tempt proceedings. Such matters may be, and likely are, involved in part in the pending appeal, Livesay Industries, Inc. and Everett G. Livesay Window Company, Inc. v. Livesay Window Company, Inc., No. 16759. Obviously we do not determine any issues concerning post-decree damages.

3. Probably first in the history of patent litigation is the curious and surprising fact that to this good day the Master's fee for the hearings and seventy-five days of lucubration has not yet been paid even though the Infringer has not superseded the final judgment.

of consequence was hotly disputed. The case then comes to us with the insulation of the clearly erroneous rule, Fed.Rules Civ.Proc. rule 53(e) (2), 28 U.S.C.A.

Of course the question was how much had the Patent Holder and Licensee suffered by the infringement. And that question was primarily: had the Infringer not infringed, what would Patent Holder-Licensee have made? That in turn involved the amount of the business actually done by the Infringer which the Licensee would have performed had there been no infringement. Once the probable volume or proportion was ascertained, other incidental questions would arise as to the relative cost, gross and net profits and the extent to which the operating experience of one party could be applied to the other.

After digesting the voluminous data of this record, the Master found, and the Court confirmed, many basic facts which are not now seriously challenged. First, in the critical period September 2, 1948 to October 8, 1951, the sales by Licensee of the patented frames manufactured by it totaled $1,137,248. This gross, *after* provisions for Federal income taxes and all expenses for cost of goods sold as well as fixed charges, produced a profit of 19.1% on sales or a total of $217,218. Of the Infringer's total business, 82.65% involved the manufacture and sale of infringing "Exhibit A" frames. This ratio applied to its gross income, fixed infringing sales at $2,912,148. Using these two figures to reconstruct what the Licensee would have made (not what the Infringer made), the Court applied the Licensee's earning ratio of 19.1% to the Infringer's total infringement sales to produce a profit of $556,664. As the Licensee's profit ratio (19.1%) was based on the payment by it of a contract 6% royalty for the exclusive license from the Patent Holder, the Court fixed a like 6% royalty on the Infringer's sales for an additional $174,776. The decree cast the Infringer for the resulting $731,440.

When it is borne in mind that to allow a patent owner to recover lost profits from an infringer is no unique treatment of this one type of wrongdoing, and that it is essentially the same problem which inheres in other instances of an interference with a valuable business right, we see that this case is not solved, as the Infringer hopes, by a mechanical application of legal precedents[4] which, here and there, may seem to be exacting or niggardly.

▮▮▮ If in all reasonable probability, the Patent Owner would have made the sales which the Infringer has made, what the Patent Owner in reasonable probability would have netted from the sales denied to him is the measure of his loss,

---

4. These are best exemplified by Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 224, 59 L. Ed. 398, 404:

"While the number of drills sold by the defendants was shown, there was no proof that the plaintiff thereby lost the sale of a like number of drills or of any definite or even approximate number. During the period of infringement several other manufacturers were selling drills in large numbers in the same localities in direct competition with the plaintiff's drill, and under the evidence it could not be said that, if the sales in question had not been made, the defendants' customers would have bought from the plaintiff rather than from the other manufacturers. Besides, it did not satisfactorily appear that the plaintiff possessed the means and facilities requisite for supplying the demands of its own customers and of those who purchased the infringing drills. There was therefore no adequate basis for an assessment of damages upon the ground of lost sales."

Other cases cited include: Seymour v. McCormick, 16 How. 480, 57 U.S. 480, 14 L.Ed. 1024; Dobson v. Dornan, 118 U.S. 10, 6 S.Ct. 946, 30 L.Ed. 63; Cincinnati Siemens-Lungren Gas Illuminating Co. v. Western Siemens-Lungren Co., 152 U.S. 200, 14 S.Ct. 523, 38 L.Ed. 411; Hall v. Stern, C.C.N.Y., 20 F. 788; Mc-Sherry Mfg. Co. v. Dowagiac Mfg. Co., 6 Cir., 160 F. 948; Oil Well Improvements Co. v. Acme Foundry & Machine Co., 8 Cir., 31 F.2d 898.

See also National Metal Weather Strip Co. v. Bredin, 3 Cir., 186 F. 490, modifying Bredin v. National Metal Weather Strip Co., C.C.Pa., 182 F. 654.

and the Infringer is liable for that. Profits, as such, are not recovered as the broadening amendment to the statute, 35 U.S.C.A. § 284, makes so clear. The profit is but the true measure of that which infringement has taken from the patent owner for, "whatever may have been the practice prior to the recent statutory amendments, the general damages *now* recoverable are the detriments suffered by the plaintiffs through the infringement." Laskowitz v. Marie Designer, Inc., D.C.Cal., 119 F.Supp. 541, 554. Where the wrong done is so absolute, the consequences of an inability to demonstrate the resulting loss with scientific accuracy rests on the Infringer, as on any other wrongdoer,[5] Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544. This principle certainly applies to patent cases.[6] Horvath v. McCord Radiator & Mfg. Co., 6 Cir., 100 F.2d 326; Filtex Corp. v. Amen Atiyeh, 9 Cir., 216 F.2d 443.

■ A brief examination will demonstrate that the record fully supports the conclusions reached below. There is first the certainty based on the fact that the period for which damages were allowed is all in the past. There is thus no uncertainty as to a future forecast as is so common. Consequently, we are not concerned, as were many of the cases, note 4, *supra*, with the possibility that the prospective consumers, had they not purchased from the Infringer, might have yet procured a suitable article from persons other than the Patent Owner. For here, the "relevant market," cf. United States v. E. I. Dupont De Nemours & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264, was for a specific product—a monolithic window frame with a Venetian blind guide, either imbedded during the casting or installed on precast pintles. The market under scrutiny then is confined to those products only which are patented or infringed. As to these, the Master found that over 95% were manufactured and sold by these two parties, Infringer and Licensee. The effort of the Infringer to make out a substantial potential competition from others, including three specified manufacturers simply fails. Pospisil, the largest, had not made a single frame with blind guides since the war and, in any case, his

5. 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544, 548:

"Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. * * *."

6. Bigelow v. RKO Radio Pictures, 327 U.S. 251, 265, 66 S.Ct. 574, 580, 90 L.Ed. 652, 660:

"The most elementary conceptions of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong has created. * * * That principle is an ancient one, * * * and is not restricted to proof of damages in antitrust suits, although their character is such as frequently to call for its application. * * * And in cases where a wrongdoer has incorporated the subject of a plaintiff's patent or trade-mark in a single product to which the defendant has contributed other elements of value or utility, and has derived profits from the sale of the product, this Court has sustained recovery of the full amount of defendant's profits where his own wrongful action has made it impossible for the plaintiff to show in what proportions he and the defendant have contributed to the profits * * *. [citing cases].

"The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery for a proven invasion of the plaintiff's rights. * * *."

product was a mixture of sawdust and concrete. The Durall Company only began operations in 1951 and for that year, out of a volume of $36,000 over 75% was for frames without blind guides leaving but one-fourth, $9,000, as competition in contrast to the average annual volume of Licensee of some $370,000. Only 150 to 200 Mozar frames are shown to have been sold, and the number of these with blind guides later installed as an "Exhibit A" frame is not shown at all. Gaines Construction Company had used a number of Infringer's frames prior to 1950, but these were discontinued and concrete blocks and a wood buck was substituted. This builder not only did not believe in blind guides. He disliked them for, in building project houses for large residential housing projects, Venetian blinds are not provided with the house.

Architects, builders and contractors testified convincingly that, despite the Infringer's claimed advantage that plastering the faces of the frame gave a more attractive surface than the cement face of Licensee's frame, the two frames were " * * * as alike as two peas in a pod." Indeed, a common thing was for the architect's written specifications to call for "Livesay concrete window frames" meaning specifically either of the two frames. At least as to all of the residences comprising the 95% with built-in blind guides which went to make up the combined volume of Infringer and Licensee, the builder, or contractor, or architects called for this type of frame. As to this market demand, the source of supply was confined to these two parties and had not the infringement occurred, the Licensee would here have had a monopoly in an article having established trade acceptance of great extent. Of course, so long as the Infringer's poaching on the Licensee's exclusive domain made frames available from two sources, the choice in any given case may well have been on the basis of the Infringer's cheaper price of $10.85 compared with Licensee's price of $12.85 per frame. But with this brisk demand stimulated by almost universal architect-builder trade acceptance, the conclusion that substantially all of these frames would have been sold at Licensee's slightly higher price was clearly justified.

Nor does the Infringer's attack on Licensee's physical productive capability undermine this award. While to us it seems amazing that such huge amounts of money could flow from such limited plant facilities, the fact remains that Licensee's small plant,[7] so disparagingly criticized by the Infringer was, in the critical period, able to turn out production grossing $1,137,248. Certainly there was nothing unique about the equipment required for plant expansion to meet increased demand. Nor was there any indication that had not the Infringer been poaching, the Licensee would not have been able to build or acquire the needed facilities.[8] With all of the grief the Patent Holder and Licensee have had, they did not, in order to demonstrate a loss, have to build a plant which, because of the Infringer's conduct, would not have been fully utilized.

Once the record supports the inference that in all reasonable probability substantially all of the Infringer's sales would have been made at Licensee's prices, the method of calculation employed by Master and Court, if erroneous is so in favor of, not adverse to, the Infringer. On the Licensee's own performance, its margin of profit after deduction for income taxes was 19.1%. The Court applied this to the Infringer's volume of infringing sales, $2,912,948, which, of course, came from sales at Infringer's prices. The Licensee's sales price was approximately 18.4% higher. Had the

7. It was apparently made up of a single cement mixer with one vibrating table and a limited number of molds and 4 small steam curers.

8. The Infringer's plan was equally simple. In 1948 it had 2 mixers, 1 vibrating table and 190 molds. These were increased in 1949 to 3 vibrating tables, 2 mixers, and 220 molds, later 265 molds. Subsequently, with its increased volume, 82.65% of which rightly belonged to the Licensee, it changed to a batching plant.

basic fact conclusions approved by us been extended with logical consistency, an·additional award of $130,792.61 could have been made.[9] This does not even take into account the possible question[10] concerning the deduction of estimated income taxes.

On the main issue then, we affirm the Court's holding. This automatically disposes of the Infringer's contention

9. This is readily demonstrated by these damage computations:

**By the Court, Using Infringer's Price**

Profits

| | | |
|---|---|---|
| Total Infringing Sales | $2,912,948 | |
| Licensee's Profit Ratio | X.191 | |
| Profits Lost to Infringer | | $556,664 |

Royalty

| | | |
|---|---|---|
| Total Infringing Sales | $2,912,948 | |
| Royalty Ratio | X.06 | |
| Royalty Lost | | 174,776 |
| Total Damages Allowed | | $731,440 |

**If Licensee's Price Used**

Profits

| | | |
|---|---|---|
| Total Infringing Sales | $2,912,948 | |
| Price Differential Ratio | X.184 | |
| Total Infringing Sales at Licensee's Price | 3,448,930 | |
| Licensee's Profit Ratio | X.191 | |
| Profits Lost to Infringer | | $655,296 |

Royalty

| | | |
|---|---|---|
| Total Infringing Sales | $3,448,930 | |
| Royalty Ratio | X.06 | |
| Royalty Lost | 206,935 | |
| Total Damages | | $862,231 |
| Less Damages as Computed by the Court | | 731,440 |
| Difference in Favor of Infringer | | $130,791 |

10. The Licensee does not appeal from the District Court's deduction of income tax so we need not determine whether, as now suggested, this was another error in the Infringer's favor. While Duplate Corp. v. Triplex Safety Glass Co., 3 Cir., 81 F.2d 352, modified on other grounds, 298 U.S. 448, 56 S.Ct. 792, 80 L.Ed. 1274; Stromberg Motor Devices Co. v. Zenith-Detroit Co., 2 Cir., 73 F.2d 62, certiorari dismissed Zenith-Detroit Corp. v. Bendix Stromberg Carb. Co., 294 U.S. 735, 55 S.Ct. 509, 79 L. Ed. 1263, and others may indicate that such deduction is permissible in ascertaining damages, tax cases, such as Mathey v. Commissioner, 1 Cir., 177 F. 2d 259, certiorari denied 339 U.S. 943, 70 S.Ct. 797, 94 L.Ed. 1359; Urquhart v. Commissioner, 3 Cir., 215 F.2d 17, 20; Annotation 99 L.Ed. 497, reflect that the recovery of damages is treated as income to the recipient. If, for example, $556,-664 is considered to be the profit the Licensee would have made *after* taxes, it is plain now that on these tax, precedents, this "net" figure will be taxed and the *real* recovery will be considerably less.

separately made that damages should have been limited to a reasonable royalty fixed by its lawyer expert at 2%. See Horvath v. McCord Radiator & Mfg. Co., 6 Cir., 100 F.2d 326; Filtex Corp. v. Amen Atiyeh, 9 Cir., 216 F.2d 443; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 649, 35 S.Ct. 221, 59 L.Ed. 398.

■ We likewise affirm the Court's holding on the period covered by the award, September 2, 1948 to October 8, 1951. While it is true that this suit was not filed until October 7, 1949, we think that within the meaning of 35 U.S.C.A. § 287, the Infringer had actual notice of the claim by Patent Holder and Licensee as early as September 2, 1948 when the Florida State Court suit was filed charging unfair trade competition and seeking a declaration and other relief. When the present Infringer, after service of process on it, came into that suit contending in its answering motion that the cause should be dismissed "for the reason that it is apparent that said cause is one for damages for infringement of alleged patent rights, and exclusive original jurisdiction over such cause is in the United States District Court," this was all that was required. The notice need only be actual knowledge that the Patent Owner is contending that there is a valid patent and that the other is infringing. Warner v. Tennessee Products Corporation, 7 Cir., 57 F.2d 642, 643, certiorari denied 287 U.S. 632, 53 S.Ct. 83, 77 L.Ed. 548. The Infringer could hardly have more clearly expressed its interpretation of that suit as a claim of infringement. The efforts of the Infringer now to find semantical magic in the words "it is apparent" do not impress us. If anything, they only make it clearer as though it was said "it is perfectly *obvious* that, the suit is for infringement."

When one acknowledges for his adversary that the adversary is claiming infringement, the law most certainly does not compel the patent owner to repeat it any more explicitly.

■ We conclude also that the allowance of attorney's fees in the sum of $110,000 was reasonable in amount and within the requirement that it be "an exceptional case" under 35 U.S.C.A. § 285. In many instances the request for attorney's fees comes from the defendant who has successfully resisted an unfounded suit for infringement by a patent owner.[11] In order to make certain that awarding of attorney's fees should not thwart the general policy that Courts are open for resolution of controversy without the litigants bearing the ultimate actual costs of the machinery, this has given rise to the rule that to award attorney's fees to the defendant, the plaintiff's action must have been instituted in bad faith, as vexatious, unjustifiable litigation with no real basis.

Whether such principle is automatically applied mechanically to the obviously different situation of the unsuccessful defendant, we do not believe, as the Infringer contends, that allowance of attorney's fees is necessarily synonymous with permissible allowance of punitive damages for wilful infringement.

Here, while the Master found against wilful infringement, that is, a deliberate calculating purpose to infringe, heedless of the patentee's rights and oblivious to the consequences, his hesitant, guarded conclusions followed immediately thereafter in the text by the allowance of attorney's fees makes clear that he considered, and the Court in the exercise of its discretion confirmed, that general circumstances of the conduct of the In-

---

11. This was so in the four cases so heavily pressed by the Infringer: Park-In-Theatres v. Perkins, 9 Cir., 190 F.2d 137, 142; American Chain & Cable Co. v. Rochester Ropes, 4 Cir., 199 F.2d 325, 330; Continental Art Company v. Bertolozzi, 7 Cir., 232 F.2d 131; Phillips Petroleum Co. v. Esso Standard Oil Co., D.C.Md., 91 F.Supp. 215, 217. See also Merrill v. Builders Ornamental Iron Co., 10 Cir., 197 F.2d 16; Turchan v. Cincinnati Mining Machine Co., 6 Cir., 208 F.2d 228.

fringer justified this allowance. Several may be mentioned briefly. The Infringer from the outset took a completely untenable position on the validity of the patent. The District Court so ruled on summary judgment at the very outset of this hoary litigation and we affirmed. Other actions revealed in the record before the Master suggest strongly that the Infringer was not, as it was clearly entitled to do, merely resorting to a court to assert its contention, and if unsuccessful, abide the consequences. After years and years of litigation[12] with the Infringer whose operations are claimed to have gone through a succession of different corporations, the Patent Holder and Licensee through ancillary creditors proceedings in aid of judgment have yet received nothing in satisfaction even though the Infringer has never superseded the judgment, see note 3, supra. Also, on the initial trial on validity and infringement leading to our affirmance, this same Master in denying the Infringer's cross claim for unfair competition held that, once validity and infringement were established and the pre-war royalty contract by its own terms was no longer applicable, it was the Infringer, not the Patent Holder-Licensee, who was guilty of deception and misleading unfair practice in the continued use of the Livesay name.

The conclusion that these were, in the exercise of a sound judicial discretion, "exceptional circumstances" was fully justified and the award of the attorney's fees was proper.

Affirmed.

---

12. This was dramatically described by the Master: "My experience in this case and my study of the considerable volume of law on the subject, leads me to believe that the law never intended that an inventor holding a valid patent, or his licensee, should have the fruits of inventive genius and business ability blighted or consumed by voracious infringement. The patentee, his assignee and the present licensee in this case, have had a running battle on their hands to try to ward off the onslaughts of the invader. It appears to me to have been a frustrating, vexatious, expensive and probably unrewarding experience. Such battle commenced with the Drolet case, Livesay v. Drolet, 38 F.Supp. 885 in 1939, in this Court, continued in the two State Court cases filed in 1948 and 1949, and has continued since 1949 with the instant litigation which was filed in that year."

Since that time, we are now told, the patent has expired while the battle was still raging.