VULTEX CORPORATION OF AMERICA et al. v. HEVEATEX CORPORATION et al.

No. 3315.

Circuit Court of Appeals, First Circuit.

Jan. 10, 1939.

Robert Cushman and William Gates, Jr., both of Boston, Mass. (Robert J. Keating, of Boston, Mass., on the brief), for appellants.

Harrison F. Lyman, of Boston, Mass. (Nathaniel P. Wharton, Edgar H. Kent, and Fish, Richardson & Neave, all of

Boston, Mass., on the brief), for appellees.

Before WILSON and MORTON, Circuit Judges, and PETERS, District Judge.

WILSON, Circuit Judge.

This is an appeal from a decree of the District Court of Massachusetts dismissing two bills of complaint which were tried together. The two cases have been consolidated on appeal. Both cases involve processes for vulcanizing the rubber particles in suspension in the milky sap of the rubber tree, which is known as latex. The crude rubber of commerce is obtained by coagulating or separating the solid rubber particles from the latex.

The two patents in suit describe processes for vulcanizing the rubber particles in suspension in the latex and before coagulation. Prior to the patents in suit there were two processes used in vulcanizing rubber known in the art as "hot vulcanization" and "cold vulcanization."

In general, in "hot vulcanization" certain well-known vulcanizing ingredients, sulphur and certain accelerators, were incorporated into a mass of crude dry rubber by a milling operation, and the mass subjected to heat above the boiling point of water and under pressure.

In "cold vulcanization" there was incorporated into the mass of crude dry rubber sulphur what were termed organic accelerators of a kind which brought about vulcanization at a temperature below that of boiling water. Such accelerators are termed "high power accelerators" or "low temperature" accelerators, and require only a relatively low degree of heat, without pressure, to vulcanize the crude rubber.

Under the first patent in suit, No. 1,-443,149, issued to Dr. Phillip Schidrowitz in 1923, on an application filed in February, 1922, it is claimed that he discovered that it is possible to vulcanize rubber in the liquid latex without coagulation or separation into crude rubber.

Under the second patent in suit, No. 1,682,857, issued to Dr. Schidrowitz in 1928, on an application filed in March, 1923, it is claimed that the discrete particles of rubber, which are separated in the latex from each other by water, may be caused to combine with the sulphur, which is not soluble in water and at temperatures below the melting point of sulphur. He discovered that the sulphur penetrates the outer shell of the discrete rubber particles in suspension in the liquid latex, and with the aid of "low temperature" accelerators vulcanizes the contents at temperatures below the boiling point of water.

It is apparent from the specifications of the Letters Patent and in general from the description of the processes involved in the two patents in issue, that the first patent in suit proposed vulcanization of the particles of rubber suspended in the latex by the "hot vulcanization" process, and the second patent in suit proposes to accomplish vulcanization by what is termed a "cold vulcanization" process.

Each method in the respective patents in suit differs from the method in use prior to Dr. Schidrowitz's alleged discoveries, in that the vulcanizing ingredients act upon the rubber particles in suspension in the liquid latex instead of upon the rubber particles after coagulation or separation from the latex in the form of dry milled crude rubber.

The first case involves claims 8, 9, 19 and 20 of Letters Patent No. 1,443,149; and the second case involves claims 7, 8, 12 and 16 of Letters Patent No. 1,682,857 —all process claims. The District Judge held that as to the patent No. 1,443,149, the claims were valid but not infringed; and in the second patent No. 1,682,857 that the claims were not valid, but, if valid, were not infringed.

We think the ruling of the District Judge was correct on the evidence that there was no infringement of patent No. 1,443,149, there being no evidence that the defendants did anything more than compound the liquid latex with sulphur and certain accelerators, but did not subject the compound to heat or pressure or to any of the vulcanizing steps described in the first Schidrowitz patent in issue.

The plaintiffs also sell a compounded latex under the name of Vultex. It is understood in case of the sale of this compound, and in case of the compound customarily sold by the defendants in commercial quantities, that the customer would take the necessary steps to bring about the vulcanization of the rubber in suspension in the latex to the degree required for his particular use.

In fact, the plaintiffs make no claim now that the method used by the defendants in their general commercial practice of selling freshly mixed unvulcanized latices,

which must be subjected to a vulcanizing operation by its customers after coagulation by the user, infringes either of the patents.

The plaintiffs in their brief to this court say:

"The usual practice of Heveatex Corporation in selling 'Formula C' and Type 'IC' is to mix the ingredients on receipt of an order and to ship the compounded latex promptly. It is the usual practice of users, who order fortnightly, to vulcanize the rubber obtained from the latices by coagulation. This is not the practice complained of.

"The acts complained of were the shipments of latex substantially vulcanized when they left the place of business of the defendant, Heveatex Corporation. This and this only is the infringement complained of."

The infringement complained of, therefore, is confined to the sale of three small sample lots of compounded latex procured of the defendants by certain of the regular customers of the plaintiffs in May, June and July, 1934, respectively. These sample lots consisted of a five gallon can of what the defendants designate as "Formula C", a one gallon can of the same formula (with the addition of certain inert coloring and filling materials) and a one gallon can of so-called "IC Compound." The first was shipped to the Lee Hardware Company at Salina, Kansas; the second to the Tyer Rubber Company at Andover, Massachusetts; and the third to the Anderson Manufacturing Company at Cambridge, Massachusetts.

It should be borne in mind that these samples were supplied ostensibly to be tested and treated by the customers to determine whether suitable for their respective uses, and were not supposed to be typical of the products of the defendants sold in their general commercial practice. These samples were not subjected to heat or any other vulcanizing steps by the defendants before shipment.

The samples ordered were not in sufficient quantity to warrant their being made up for supplying the particular order and for immediate shipment thereafter, as would occur in practice, in case of an ordinary order for a considerable quantity.

In general, the procedure indicated in the second Schidrowitz patent, No. 1,682,-857, differs from the procedure set forth in the first Schidrowitz patent, No. 1,443,-149, in the same way that the so-called "cold vulcanization" process, when applied to crude rubber, differs from the so-called "hot vulcanization" process applied to crude rubber.

It is conceded that latex, when compounded with sulphur, an accelerator, and activator like zinc oxide, may undergo changes even at room temperature and after a time may show incipient vulcanization.

If these samples infringed either of the Schidrowitz patents, it must have been the second patent, since no heat was applied by the defendants nor any other vulcanizing steps taken before shipment. Therefore, upon this record, any vulcanizing that occurred must have been due to the age of the mixture or the temperature to which it may have been subjected in transit, and not to any intentional act of the defendants.

The District Court held that claims 7, 8, 12 and 16 of the second Schidrowitz patent were not valid, as the same process was covered by the claims of the first patent, and that the mixing with latex, sulphur, zinc oxide and certain "ultra accelerators" or "low temperature accelerators", such as piperidine or a derivative thereof, known in the art as "pip-pip", was in common use in the prior art upon milled crude rubber, and it did not disclose invention to apply the same process to latex. It is suggested also that he might have taken the ground that, since the specifications and claims of the first patent stated that vulcanization of the latex might be accomplished by any other method than that described in the claims of the first patent, and as the invention, according to the specifications, is not restricted to any particular method of vulcanization, the second process was covered in the first patent and for this reason was invalid.

The art of vulcanizing rubber is not a mechanical process, the result of which can be determined within a definite degree of certainty, but is an empirical process. It could only be reached by experiment. The chemical changes in rubber when vulcanized, or the action of sulphur when combined with it, are not understood. If the application of what is known as "hot vulcanization" in the case of crude rubber when applied to latex results in the vulcanization of the particles of rubber in suspension in the watery latex after the application of heat, it does not necessarily

follow that a compound of latex with zinc oxide and a "low temperature" accelerator without the application of heat or pressure would result in the vulcanization of the rubber particles in suspension in the liquid latex. We think that the discovery of this by Dr. Schidrowitz by experimentation was a step in advance over the prior art, and also of the so-called "hot vulcanization" discovered by Schidrowitz as applied to latex, and disclosed in the first patent in issue, and that the second patent was valid.

The vulcanization of crude rubber by the hot and cold method had been in use for nearly seventy years and no one before Schidrowitz had discovered that substantially the same processes, with some modifications, could be applied to latex before coagulation. This may in part have been due to the inability in this country readily to obtain a supply of latex for experimentation. At least, many of the authorities on vulcanization of rubber give credit to Schidrowitz for making the discoveries set forth in the two patents in suit.

But, assuming that the second Schidrowitz patent discloses a patentable invention, it is strenuously urged by the defendants' counsel that the samples supplied to the Lee Hardware Company, the Anderson Manufacturing Company and the Tyer Rubber Company did not constitute infringement of either of the patents in suit.

As already pointed out, there was clearly no infringement of the first Schidrowitz patent. The samples were at no time subjected to heat or pressure before leaving the defendants' plant.

Apparently the cases hinge on the proper definition of vulcanization as used commercially and in the art.

The defendants claim and support their contention by quoting from Dr. Schidrowitz's testimony in the record to the effect, as they claim, that commercially and in the art, vulcanization is a state produced in a particular compound, in which no further changes occur. In other words, while vulcanization is a progressive change in the character of the material, it is not until it is vulcanized as a finished product for a particular use, in which case no further change takes place, that commercially it is termed vulcanized.

In answer to a question by defendants' attorney Dr. Schidrowitz testified as follows:

"X-Q. Vulcanization is a step which fixes the characteristics of the finished product as regards these characteristics?" Dr. Schidrowitz answered: "Yes,—broadly, yes."

Again, in answer to the following question:

"X-Q. When you get a vulcanized product, a vulcanized piece of rubber, during the course of time is its quality constant if you get a properly vulcanized piece of rubber?" He answered without qualification, "Yes."

Variations in the vulcanizing procedure can be controlled and predetermined by the conditions under which the vulcanizing steps are performed; but in all cases in a vulcanized product as understood commercially, the characteristics of the finished product are fixed finally and no further change takes place. Its characteristics are fixed and stable for the purposes for which it is to be used.

Omansky, plaintiffs' expert tester, in defining vulcanization—though his experience in working with latex appears to have been limited—testified:

"Q. Will you just, very briefly, define what vulcanization is, what you mean by that, what vulcanization means in the industry? A. In the industry vulcanization means that the result of the reaction with sulphur, the physical properties of rubber are changed so that the resulting rubber, dry rubber, depending on its source, is no longer sensitive to temperature changes."

Again, he defined vulcanized latex in his testimony as follows:

"X-Q. Now, the reaction which takes place in connection with the vulcanization of latex is the same in nature as that which takes place in the vulcanization of crude. rubber, or a very dry rubber mix, is it? A. It is the same in principle but it differs in detail.

"X-Q. It takes the form of a chemical reaction of some unknown sort between the sulphur and the rubber particles, with resulting changes in the physical condition of the rubber particles? A. That is right.

"X-Q. I would like to have you define what you mean by vulcanized latex? A. *It is one where the rubber particle in the latex has combined with sulphur to an extent sufficient to permanently change the rubber so that it is more resistant to solvents, so that it has obtained an elasticity at the expense of plasticity, so that the*

*dry film, or the coagulum with the water removed, resembles the properties of vulcanized rubber,—the desirable physical properties of vulcanized rubber.* (Italics supplied.)

"X-Q. Such vulcanized latex requires no further heat treatment on the drying of the film? A. It need not require any further heat treatment."

His views are further explained in the record as follows:

"X-Q. That is, in the case of the Lee sample, at the time of your first analysis of it, it was partially vulcanized? Is that right? A. You can call it that if you want to.

"X-Q. Partially vulcanized? And upon standing a while longer it became what you call completely vulcanized? A. I did not call it partly or completely; I called it completely at the start.

"X-Q. All right. At any rate, if it was completed at the start it could not have been more complete later on, could it? A. Yes, it is a very common term in the industry—over-vulcanized.

"X-Q. All right. Then there was a progressive change from what you would call a complete vulcanizing to an even more complete vulcanizing, which you call an overvulcanization? A. I cannot accept the term 'more complete.'

"X-Q. Neither can I, Mr. Omansky, and that is why I wondered why you could say that the first sample was completely vulcanized and then that it was more vulcanized later on. Now I would like to have you explain to the court what you meant by that. A. Vulcanization is a progressive step. I think, as I mentioned in direct testimony, it can go on from a small percentage of sulphur to produce certain very desirable results, as in surgeon's gloves, steam hose, air hose, and the tubes intended for use in truck and bus tires. That vulcanization can progress further to produce a condition of rubber which is more suitable for resistance to abrasion, such as you find in the treads of automobile tires. That process can continue still further to produce materials which do not require so much flexibility but get more scratching than a tire, such as a rubber heel. That process can continue still further until you have as much as 25 to 35 per cent of sulphur combined with the rubber, until we get what you call artificial whale bone. The process can again continue still further until you get a hard rubber, such as in radio panels and battery boxes. So that partial vulcanization, or complete vulcanization, does not mean that you have to carry it on until no more sulphur is there. It means, until you have reached the stage where the rubber possesses the desired properties for its intended use.

"X-Q. For this particular use? A. Yes.

"X-Q. Well, at any rate, the evidence that you got from these samples is that the longer they stand the more the degree of vulcanization progresses? A. Yes, that is true."

Evidently the defendants' samples were not vulcanized latex, nor do the defendants use any process that produces a vulcanized latex as that term is used commercially or in the art. An essential characteristic of a vulcanized product, commercially and in the art, whether crude rubber or rubber particles suspended in latex, is whether by the treatment they received they have acquired fixed and determined characteristics for a certain use which do not materially change with the lapse of time.

The District Court evidently accepted this definition. It is clear that none of the three samples, which it is contended infringe the second patent in suit, were vulcanized within this definition. The state of vulcanization of each sample, even if the plaintiffs' expert testimony is accepted at its face value, was progressive, the characteristics of each sample were not fixed beyond further change when received by the customer. Whether Omansky made more than one test of the Tyer sample or not, he testified that it was not so completely vulcanized as the Anderson sample, and that the state of vulcanization of the Anderson sample on a second later test proved to be progressive. It follows, therefore, that the Tyer sample, on a later test for the degree of vulcanization, would also have proved it to be progressive. Their condition in any event was not due to any action by either of the defendants, but was obviously due to age or the temperature to which they had been subjected after shipment.

In particular, the sample supplied to the Lee Hardware Company in May, 1936, was shipped to Kansas and then, without being opened, it was reshipped to the plaintiffs' expert at Cambridge, Massachusetts. It was in transit twelve days in the heat of early summer. It would be a miracle if

vulcanization had not then progressed to a point where an expert, on application of certain tests, could not detect some degree of vulcanization.

The compounded latices of the defendants had not acquired that fixed characteristic of a vulcanized product. On the contrary, the qualities of its compounded latex changed progressively with time, even at room temperature. Heat treatment to be applied by the customer to the coagulated product made from the latex of the defendants would be required to vulcanize and fix and stabilize the qualities of the product.

It is a significant fact that, although each of the three parties ordering these samples wrote the defendants to the effect that they were desired for a specific use in their business, yet on receipt of the samples, without being opened, they were immediately shipped to the plaintiffs' expert for testing as to vulcanization and not to determine whether they were suitable for the use specified. There is no evidence that either of the companies ordering the samples ever learned of the result of the tests by Mr. Omansky; nor were the defendants ever notified that the plaintiffs relied in their suits upon any sample except the five gallon lot shipped to Kansas and from Kansas to Massachusetts until two days before the trial. Neither did the defendants have access to the samples for testing or for cross-examination of plaintiffs' experts until two years after they were delivered, when such tests were futile.

We do not think the letter of the Lee Hardware Company to the defendants that what they desired was an article that would require no heat treatment, only quick drying, necessarily indicated a vulcanized product. Several of the samples had had no heat application, yet Omansky testified they were "completely vulcanized."

In each case it is evident that the samples were of uncertain age when shipped. They were not sold as typical of the commercial product of the defendants, which the plaintiffs admit does not infringe. They were supplied to determine whether the defendants could furnish a product which, if treated by the customer in the customary manner, would meet certain particular needs of the customer. However, the samples clearly were not obtained for that purpose but to obtain, if possible, evidence of infringement. While technically there was evidence of vulcanization to a certain degree, it was not evidence of a final and complete vulcanization such as would fix the characteristics of the sample for a particular use. To hold that there was infringement upon this testimony would give the plaintiffs a monopoly that the patent statute does not contemplate, since the use of such compounded mixtures by a customer who treated it to secure vulcanization to a degree suitable for his purpose, would be liable to a claim of infringement. It would be impossible to make up a compound that, before being used by a customer, might not show evidence of progressive vulcanization and subject either the seller or the buyer to a suit for infringement. This accidental incomplete vulcanization of a *compounded* latex is not covered by the patent which clearly contemplates a vulcanization which is complete although it may be light. The District Judge found, adopting the defendants' argument, that "defendant's product is not a vulcanized latex nor does defendant use any process which produces a vulcanized latex." In view of the conflicting testimony we cannot say that this finding was clearly wrong. The contrary view brings within the scope of the patent compounds which had been in use before the date of the application.

The testimony of the officials of the Lee Hardware Company is at variance with Mr. Omansky's testimony. The officials of the Lee Hardware Company in their correspondence at some length stress the purpose for which it desired the sample, viz.: for binding and tabbing, and wrote the defendants that the sample was not suitable for that purpose; yet Omansky testified that it was vulcanized to just the point to make it desirable for that purpose.

On this point Omansky testified as follows:

"Q. Now, Mr. Omansky, you testified that you performed a chloroform test on this material on the day it was received, and it indicated, it showed a Class 2 coagulum. Were you able to base any opinion, as the result of that test, of the presence or absence of vulcanization in that material before it was coagulated? I am speaking of the Lee material. A. In the Class 2 test it showed that the material was vulcanized.

"Q. To what extent for tabbing, bookbinding purposes? A. To the extent that is most desirable for tabbing and bookbinding purposes.

"Q. Will you state whether or not any further vulcanization after coagulation would be desirable or undesirable? A. Further vulcanization of the rubber for its specified use would be undesirable.

"Q. Further vulcanization after coagulation? A. Yes.

"Q. Now I understand it is your opinion that this material, on the day you received it, was vulcanized and completed for tabbing and bookbinding purposes? A. Yes.

"Q. You base that on the chloroform test? A. I do, and on the knowledge of what bookbinding requires.

"Q. And tabbing? A. And tabbing, too."

How the Lee Hardware Company discovered it was not suitable for that purpose is not clear, since the five gallon sample was immediately shipped back to Massachusetts as soon as received without being opened. If they received back from Omansky a sample of the shipment on May 29, 1934, it was some time after it was originally received from the defendant corporation.

The District Court found that the samples did not show vulcanization within the meaning of the art, to the extent that constituted infringement.

An analysis of the expert testimony pro and con would serve no useful purpose in an opinion. It is of the customary character of expert evidence and carries no great weight owing to its vague and contradictory nature.

Since there was not sufficient evidence of, infringement by the defendant corporation, it is not necessary to discuss whether on the evidence the president and general manager of the defendant corporation is also liable. In any event, there is not sufficient evidence in the record to warrant holding him, as an officer of the defendant corporation, liable for infringement under the test laid down in such cases in Schiff v. Hammond Clock Co., 7 Cir., 69 F.2d 742, 745.

We think the District Court erred in holding that the second patent in suit disclosed no invention over the first or over the prior art. The second patent being held valid but not infringed the decrees of the District Court should be affirmed.

The decrees of the District Court dismissing the bills are affirmed with costs.