## SCHIFF v. HAMMOND CLOCK CO.
### No. 4967.

Circuit Court of Appeals, Seventh Circuit.
March 22, 1934.

appeared many electric clocks constructed upon principles somewhat similar to present day electric clocks. They were not entirely satisfactory in that they were difficult to start and would not continue to run indefinitely. The inventions of the principal patents in suit were directed to mechanisms which would cause the clock "to start readily every time the starter is manually twirled and to run through current interruptions and disturbances.".

Preliminary to a consideration of the patents it is necessary to dispose of two important legal questions which are seriously advanced by appellant, and their consideration necessitates an additional fact statement. The decree was entered against Henry Schiff and the Electric Clock Corporation of America. The former was president of the latter. He, alone, has appealed. He and his wife and his son were the owners of all the stock of this company. He and his wife each held one share, and his son held 98 shares. Each received a salary of $200 a week and a substantial bonus in addition.

Schiff sought a license from appellee to use the latter's patents. The application was refused, and Schiff stated that he would make appellee's clocks without a license from the patentee. Thereupon, the Electric Clock Corporation of America was formed. It secured one of appellee's clocks and made a copy of each and every part. Thousands of such clocks were made and sold. The debts of the Electric Clock Corporation of America were unpaid. The proceeds from the sale of the clocks were distributed among the three stockholders. When this suit was instituted the Electric Clock Corporation became a bankrupt. Liability for damages arising out of its infringement was thereby defeated.

Appellant disputed liability on the ground that he was merely an officer of the bankrupt company and therefore not liable personally for the tort of the company of which he was but a stockholder and an officer. The court found:

"Defendant * * * Schiff, as an individual, and not as officer of the Electric Clock Corporation of America, at various times sold electric clocks * * *.

"The * * * (Electric Clock Corporation of America) was organized by the defendant * * * Schiff, and he and his wife and son held all of the stock in the corporation.

" * * * Schiff had attempted to procure a license under the patents of The Ham-

Maurice S. Cayne, of Chicago, Ill., for appellant.

Williams, Bradbury, McCaleb & Hinkle, Clifford C. Bradbury, and Casper William Ooms, all of Chicago, Ill., for appellee.

Before ALSCHULER, EVANS, and SPARKS, Circuit Judges.

EVANS, Circuit Judge (after stating the facts as above).

The clock art is very old, and the non-self-starting synchronous motor driven clocks were among the first of the electric type to appear. Back in 1895 in Germany, there

mond Clock Company and when refused organized the Electric Clock Corporation of America to manufacture clocks of the type here complained of,

"* * * copied almost identically from a clock made by The Hammond Clock Company and the conformity of detail and dimensions is so complete that these two clocks made by the Electric Clock Corporation of America must have been deliberately designed after the pattern of the clock made by The Hammond Clock Company."

The evidence showed quite clearly that Schiff purchased clocks from the Electric Clock Corporation and, as sole owner, sold them to customers. In one of his letters he stated:

"* * * I have purchased merchandise from said Electric Clock Corporation of America in an amount of upwards of $25,-000.00.

"The merchandise that I have sold to you from time to time, during the past sixty days, is merchandise that I have purchased for cash from the Electric Clock Corporation of America * * *.

"I warrant to you that all of the said merchandise is my property * * *."

The Electric Clock Corporation also wrote a letter stating:

"* * * Mr. Schiff has purchased and paid for approximately $25,000 worth of merchandise of our manufacture, and is entitled to dispose of same in any manner or to any individual that he may see fit."

Appellant waived its claim against the Electric Clock Corporation, bankrupt, in a document filed in the court of bankruptcy, a copy of which waiver is set forth in the margin.[1]

Appellant's two principal contentions in this court are that (a) the decree as to Schiff was erroneous, and (b) the release of the Electric Clock Corporation of America also discharged the liability of Schiff, if any ever existed. .

■ (a) The facts do not support appellant's contention that he is not liable individually for the alleged infringements. As an indi-

vidual he purchased from the Electric Clock Corporation of America clocks which infringed the Hammond patents. He then sold the clocks to the trade. By so doing, he became an infringer. Directoplate Corporation v. Huebner-Bleistein Patents Company (C. C. A.) 44 F.(2d) 783.

■ (b) Nor can complete exemption from liability be avoided because of the release of his joint tortfeasor, the Electric Clock Corporation of America. Setting to one side for the moment appellee's contention that the waiver or release of the claim in the court of bankruptcy did not bar appellee's right to proceed against Schiff, it is apparent that Schiff's sale of clocks was not a joint tort. It was a tort which appellant alone committed. Such being the situation, it follows that any waiver of appellee's claim against Electric Clock Corporation of America did not release Schiff from liability for damages for which he, as an individual infringer, was solely responsible.

■ In considering this question, it is necessary for us to keep in mind that infringement may be of a patentee's right (a) to make, (b) to use, or (c) to sell the patented article. Two parties may be joint infringers as far as the making is concerned, while only one may be an infringer as far as the sale or the use is concerned. That is the situation in the instant case. Schiff and the corporation may have been joint infringers in the manufacture of the clocks. Schiff, however, was the sole infringer when he individually sold the clocks to the trade.

■ Concerning the validity and infringement of the patents in suit, save the Michl reissue patent, we have concluded to accept the District Court's finding and conclusion respecting their validity. Likewise, we have no hesitancy in saying all patents were infringed.

■ As to the Michl reissue patent No. 17,-779, the only claim in issue is claim 12, which reads:

"In an alternating current electric clock, the combination of a synchronous motor, means for launching said motor at a speed

---

[1] "The undersigned, the Hammond Clock Company, a corporation of Delaware, being an alleged creditor of the Electric Clock Corporation of America, Bankrupt, as part consideration of the sale to Simon Wexler of certain assets of said Bankrupt approved this day in the matter of Electric Clock Corporation of America, Bankrupt, now pending in the United States District Court, Eastern Division thereof, as case Number 49588, does hereby waive any and all claims in bankruptcy against said estate of Electric Clock Corporation of America, as above mentioned, and does further waive the rights of participation as such alleged creditor in any dividend or dividends that may be declared in said estate."

greater than synchronism, and mechanical movement and inertia means for causing said motor to fall into synchronism from any super-synchronous speed."

We believe this claim is anticipated by the La Cour patent issued in the United States, May 7, 1878, which dealt with the general subject of "improvement in isochronous and synchronous movements for telegraphic and other lines."

Claim 12 of the Michl reissue patent dealt with a combination in a clock mechanism of a simple alternating current motor with a mechanical stabilizing device to facilitate starting and to prevent hunting. The novel feature was the stabilizing device which consisted of a friction and inertia means designed to take work or energy out of the rotor into synchronism or to keep it there.

The La Cour patent in its specifications described means for causing a motor to fall into synchronism from any super-synchronous speed. Both the Michl reissue patent in suit and the La Cour patent recognized and dealt with the difficulty of starting the electric clock.

There can be no doubt that the La Cour device disclosed the means called for by claim 12 of the patent in suit for bringing the motor from the super-synchronous starting speed into synchronism.

Counsel seeks to distinguish the La Cour patent on the ground that it did not appear to be run by an alternating electric current. La Cour did, however, disclose the use of his device to drive a clock. Therefore, the difference between claim 12 and the La Cour patent is narrowed to the limitation of "alternating current" as an energizing means for the electro-magnet of the motor.

We believe it would be unjustifiable to so limit the La Cour disclosure as to exclude alternating current driven clocks. The problem was the same—the providing of means to enable manual starting of the motor without difficulty. To a solution of this problem, both patents were directed. One dealt with an alternating current and the other an intermittent current. We are unable to see how the difference between the alternating and the intermittent current affected the problem (or the means) for reducing the super-synchronous speed to the synchronous.

This disposition of appellant's assignments of error necessitates an affirmance of the decree so far as the injunctive relief is concerned. It does not, however, require an affirmance of that part of the decree which subjected appellant to liability for all damages which appellee suffered by reason of the infringement of both defendants, appellant herein and the Electric Clock Corporation of America. In other words, the decree, as to damages, was so drawn that its affirmance can only be sustained in its entirety, on the theory that appellant was responsible for all infringements—for those of the corporation as well as those of appellant.

Before there can be an affirmance of the decree, we must affirmatively answer the question, Was appellant as president of the Electric Clock Corporation liable for its infringements? Likewise, we must meet the defense of the effect of the release of one joint tortfeasor for joint infringements.

The test which determines an officer's liability for infringement of a patent by the corporation was set forth in Dangler et al. v. Imperial Machine Co. (C. C. A.) 11 F.(2d) 945. It may be stated as follows:

When one who is an officer of a corporation personally or individually participates in the manufacture or sale of the infringing article—that is, acts other than as an officer—or when he uses the corporation as an instrumentality to carry out his own wilful and deliberate infringements, or when he knowingly uses an irresponsible corporation for the purpose of avoiding responsibility for the damages resulting from patent infringements, he is liable jointly with the company.

Applying this test to the facts in the instant case, we find ample support for holding appellant on the ground that he used an irresponsible corporation as an instrument or tool to carry out his own wilful infringements.

Only a few references to the testimony will be made.

When appellant was refused a license by appellee to manufacture the electric clocks under the patent in suit, he stated, "That if he did not get a license the clocks would be made by a new corporation." The corporation was soon formed. Most of the stock was issued to the son. Nevertheless, on the trial, appellant testified that his son was in Germany in the latter part of 1931 and that he did not know where he was in 1932. This was the period when the infringement took place. The books showed the purchase of large amounts of merchandise. Yet the companies selling this merchandise charged the same to appellant. Likewise, when the company returned merchandise, the credits were given to appellant. Appellant's letters to the customers to the effect that the clocks be-

longed to him also confirm appellee's contention that the corporation was but a shell wherein the infringer concealed himself while he raided the electric clock business. It is impossible to reconcile the testimony of the son's salary and bonus with his absence during the interval which covered the infringement period. The son was in a foreign land, his whereabouts unknown. The story of his compensation and bonus and his ownership of ninety-eight per cent. of the stock might well be rejected as the explanation of an unscrupulous knave seeking to avoid liability for his wrongdoing. Nor can the charges on the books which showed the son had withdrawn merchandise exceeding $20,000 be explained on any theory of honest dealing. It is difficult to conceive of a clearer case of liability of an officer of a corporation for the tortious acts of the corporate creature which said officer created to hide behind when responsibility for his misdeeds was sought.

Appellant further argues that he was relieved of the liability for the joint tort of the corporation and appellant because of the release of his joint tortfeasor, the corporation. This contention merits our serious consideration.

Appellee seeks to avoid the consequences of such release by showing that the Electric Clock Corporation was a bankrupt at the time the release was executed, and inasmuch as the estate of the bankrupt was not liable for infringements during the period of its solvency the so-called release or waiver was ineffectual.

There seem to be two answers to this position. There was evidently a consideration which passed to appellee for the execution of this release. Whether the claim was good or bad, as against the estate of the bankrupt, the fact remains that appellee received a valuable consideration for its execution. It is therefore not in a position to assert the inefficacy of its release.

Nor are we prepared to hold that the estate of the bankrupt is not liable under any and all circumstances for damages arising out of its infringement of a patent committed by it prior to bankruptcy. It seems more equitable to hold that liability of a bankrupt to the holder of a patent for damages sustained may be enforced under that exception to the rule announced in Schall v. Camors, 251 U. S. 239, 40 S. Ct. 135, 64 L. Ed. 247. In other words, claims which are purely *ex delicto* and not reduced to judgment may be excluded under section 63 of the Bankruptcy Act (11 USCA § 103), except where the tortfeasor obtained something of value for which an equivalent price ought to be paid. On the theory that an infringer may be held as a trustee *ex maleficio* for profits by him obtained through his wrongful use of another's patent, the estate of the infringer in bankruptcy should be liable to the extent that the estate of the bankrupt was enriched by profits it enjoyed through its infringement.

This being our conclusion, it follows that a valid release of the estate of the bankrupt operated as a release of appellant for the joint infringements of appellant and the corporation, although it did not release appellant from liability for infringements which he alone committed.

The decree is modified so as to eliminate therefrom claim 12 of the Michl reissue patent 17,779, and to restrict the recoverable damages to the infringements which appellant alone committed and, as modified, is affirmed.