SAF–GARD PRODUCTS, INC., an Arizona Corporation, et al., Plaintiffs,

v.

SERVICE PARTS, INC., an Indiana Corporation, et al., Defendants.

Civ. No. 70–455 PHX WEC.

United States District Court,
D. Arizona.

May 6, 1980.

---

Samuel J. Sutton, Cahil, Sutton & Thomas, Phoenix, Ariz., for plaintiffs.

Eugene C. Knoblock, Oltsch, Knoblock & Hall, South Bend, Ind., John H. Killingsworth, O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, Phoenix, Ariz., for defendants.

## FINDINGS OF FACT CONCLUSIONS OF LAW

CRAIG, Senior District Judge.

## I. INTRODUCTION

The issues of liability in this case have been adjudicated through appeal, *Saf-Gard Products, Inc. v. Service Parts, Inc., et al.,* 370 F.Supp. 257 (D.C.Ariz.1974), *aff'd,* 532 F.2d 1266 (9th Cir. 1976), *cert. denied,* 429 U.S. 896, 97 S.Ct. 258, 50 L.Ed.2d 179, 191 U.S.P.Q. 765 (1976). This matter is now on remand for determination of the amount of damages to be awarded plaintiff.

* The following citation forms are used: "R–" refers to the specified page in the trial record; "PTO–" refers to a particular page and paragraph in the Pre-Trial Order entered March 3, 1980; "FOF–" and "COL–" refer to the speci-

This court's judgment on liability provided: (a) that the litigated Patent No. 3,601,-181 (Avrea) is valid; (b) that the litigated patent has been infringed by the defendants; (c) that the defendant Service Parts, Inc. has committed acts of unfair competition in conjunction with its manufacture and sale of radiator accessory devices; and, (d) that this is an exceptional patent case under those discretionary portions of the statute which allow for an award of treble damages, interest, attorney's fees and costs. 35 U.S.C. §§ 284, 285 (R–2257 *) This decision was appealed by the defendants under the special interlocutory provisions applicable to judgments for patent infringement which are final except for accounting. 28 U.S.C. § 1292(a)(4). The affirming appellate decision did not specifically address ". . . the district court's holdings pertaining to unfair competition, for these matters may become moot by reason of the district court's determination as to damages for infringement in the accounting phase of this trial." 532 F.2d, at 1273. Because the award in this case is based entirely upon the statutory provisions pertaining to patent damages (35 U.S.C. §§ 284, 285), the unfair competition issues are in fact rendered moot.

The damage issues were tried to the court commencing on March 18, 1980. Upon conclusion of the trial, the matter was taken under advisement, pending submission of memoranda by the parties. These memoranda having been received and reviewed, together with the documentary and testimonial evidence developed at trial; and, the court being fully advised in the premises, reaches the following findings of fact, conclusions of law and judgment:

## II. FINDINGS OF FACT

1. The plaintiffs, Saf-Gard Products, Inc. and Walter C. Avrea, are together possessed of the exclusive right to sue for and collect damages for past infringement of

fied paragraph in the Findings of Fact and Conclusions of Law in the liability decision; "PX–" and "DX–" refer to the designated trial exhibits of the plaintiff and defendant, respectively.

the litigated Patent No. 3,601,181 which issued on August 24, 1971. The plaintiff, Walter C. Avrea, is owner of the entire right, title and interest in and to the litigated patent (PTO–20, paras. 2 and 3). The individual plaintiff has not asserted a separate claim for damages and accordingly the plaintiffs will be hereinafter referred to in the singular.

2. Although this action was originally commenced against some fifteen defendants, only five of the defendants remained at the time of the liability trial, the action having been dismissed with respect to the other ten defendants pursuant to a series of consent judgments. Shortly before commencement of the damage trial, a stipulated judgment was entered against the defendants Balkamp, Inc. and Genuine Parts Company, finding that these defendants "have not manufactured but have sold approximately one hundred thousand (100,000) devices which infringe the litigated patent." These devices were manufactured and supplied by the defendant Service Parts, Inc. (R–2221). Judgment in the amount of $200,000 was entered against Balkamp, Inc. and Genuine Parts Company on February 13, 1980. The remaining defendants are Service Parts, Inc. ("Service Parts"), Town and Country Chrysler Plymouth ("Town and Country") and Marvin Hawkes, dba Hawkes Radiator Service ("Hawkes").

3. The plaintiff does not assert a claim for infringement prior to issuance to the litigated patent and the defendants concede that they are liable for patent infringement in some amount (PTO–20, paras. 4 and 5).

4. The defendant Service Parts manufactured the infringing devices involved in this action (R–2220). Although the defendants Town and Country and Hawkes have sold only a limited number of the devices manufactured by Service Parts, each of these defendants have contested the issues of infringement, validity and damages throughout the ten-year course of this litigation.

5. Between the time the litigated patent issued and the time that the defendants were enjoined from further infringement, the defendant Service Parts manufactured and sold a total of 325,989 infringing devices: 18,088 were sold during 1971 (September through December); 132,971 were sold during 1972; 171,269 were sold during 1973; and, 3,661 were sold during January of 1974 (PX–31.1).

6. Prior to issuance of the litigated patent, the defendant Service Parts sold at least 193,922 devices which embodied the plaintiff's invention: 4,989 were sold during the last half of 1969; 97,727 were sold during 1970; and, 91,206 were sold prior to September 1, 1971 (PX–31.1). As to these devices, the plaintiff has asserted a claim for damages based upon the prior ruling that Service Parts is liable for unfair competition due to its misappropriation of plaintiff's trade secrets and its interstate use of a mark confusingly similar to plaintiff's common law trademark "Coolant Recovery System" (PTO–12, 13).

7. During the years 1969 through 1974 (January), the average selling prices charged by the plaintiff for its patented devices and by the defendant for its infringing devices were as follows (PX–30.2, 31.1, 31.2, 34.1):

| Accounting Year | Plaintiff's Selling Price | Defendant's Selling Price |
|---|---|---|
| 1969 | $5.45 | $4.02 |
| 1970 | 4.57 | 3.51 |
| 1971 | 3.20 | 3.11 |
| 1972 | 3.01 | 2.99 |
| 1973 | 2.70 | 2.91 |
| 1974 | 2.58 | 2.93 |

8. The average costs per unit incurred by plaintiff in the manufacture and sale of its patented products for each of the years 1969 through 1974 were as follows (PX–30.-2):

| Accounting Year | Plaintiff's Cost/Unit |
|---|---|
| 1969 | $2.02 |
| 1970 | 2.07 |
| 1971 | 2.32 |
| 1972 | 1.94 |
| 1973 | 1.49 |
| 1974 | 1.29 |

9. The total per unit cost incurred by the plaintiff in the manufacture and sale of

its patented devices includes all of its variable costs for: materials, packaging, assembly labor, sales commissions, cash discounts, freight charges, bad debts, payroll taxes, advertising, public relations, promotion expenses, contributions, sales expenses and employee benefits (PX–30.2, 30.3). These are costs which were directly related to the number of devices sold by the plaintiff. The plaintiff would have incurred substantially the same variable costs had it, rather than the defendant, sold the infringing devices. However, these variable costs may have been lower had plaintiff's manufacturing volume been higher. The plaintiff's fixed overhead expenses for items such as rent, executive salaries, utilities, subscriptions, etc. are not properly considered in calculating the costs which the plaintiff would have incurred had it manufactured the additional devices sold by the defendant. These fixed overhead expenses were actually paid by the plaintiff as they were incurred during the years 1969 through 1974. These fixed overhead expenses would have neither increased nor decreased had plaintiff's production incorporated the defendant's additional sales. Plaintiff's fixed overhead expenses had already been amortized over and paid out of plaintiff's actual sales. To include these fixed expenses as an element of the plaintiff's cost in this proceeding would essentially require that the same fixed costs be reamortized over the defendant's infringing units. This would result in a windfall to the defendant in the form of a credit against plaintiff's profits, a credit which would have the effect of retroactively increasing the plaintiff's rent, property taxes, executive salaries and utility bills in proportion to the number of infringing devices sold by the defendant. The unrebutted testimony in this case indicates that none of the plaintiff's fixed overhead expenses would have increased had the plaintiff's production been expanded to incorporate the infringing devices.

10. The testimony and record in this case indicate that the corporate plaintiff sought to exercise its exclusive right to manufacture under the litigated patent and did not grant licenses to others. Accordingly, the plaintiff and its customers were the only sources from which the patented devices could be lawfully purchased. Throughout the period in question, the plaintiff manufactured and sold only radiator accessory devices of the type described and claimed in the litigated patent and conducted no other substantial business (PTO–25, para. 23). The devices manufactured by the plaintiff were distributed through major firms such as Sears, J. C. Penney's, General Motors, Ford, American Motors and numerous others (FOF–38, 39, 40). The unrebutted testimony of plaintiff's former president, William H. Avrea, indicates that the cartons containing the patented products sold by plaintiff were marked with the number of the litigated patent from its date of issue (see Defendant's Post-Trial Memorandum, page 5). Furthermore, the plaintiff was contractually obligated to include the statutory notice on the patented products (DX–AAA–19, para. 8).

11. During 1969, when the defendant Service Parts commenced production and sale of its accused devices, the plaintiff's average selling price was $5.45 per unit (PX–30.2). The defendant entered the market at an average selling price of $4.02 per unit. As established at the liability trial, the defendant was able to commence the production and sale of its devices only fifty-five days after having received the plaintiff's confidential trade secret information and without having to perform any independent research, development or experimentation (FOF–45, 46, 47). The plaintiff, on the other hand, had been required to expend nearly two years in the development, testing and improvement of its patented product, including the development, with Stant Manufacturing Co., of an entirely new type radiator cap which was not susceptible to air leakage during the cool-down cycle (FOF–42, 43; COL–40). The defendant could well afford to enter into competition with plaintiff at a substantially lower selling price.

12. Throughout the succeeding years, the defendant continued to decrease

its selling price for infringing devices and placed the plaintiff in the position of either doing the same or losing an even greater share of its market to the defendant (PX–34.1). Graph A, reproduced in the Appendix to this opinion, illustrates the relative share of the market occupied by the parties during the 1969–1973 period. This graph shows, by way of example, that in 1969 the plaintiff occupied approximately ninety-four percent (94%) of the relative market compared to the defendant's six percent (6%) share. During the following year, plaintiff's share was only thirty-one percent (31%) as compared to the defendant's share of sixty-nine percent (69%) (PX–34.1). Graph B in the Appendix illustrates the step-by-step reduction in the defendant's average selling price and the corresponding reductions in the plaintiff's selling price (PX–34.1). The testimony indicates that this forced reduction of plaintiff's selling price was a principal factor contributing to the plaintiff's financial problems which ultimately lead to the termination of plaintiff's business in early 1974. The defendant has sought to establish that, because the plaintiff's profits during the accounting period were either low or non-existent, the plaintiff has not proven any loss of profits which could be attributed to defendant's infringing activity. This assertion is both contrary to the facts (PX–30) and illogical. The defendant's sale of infringing devices at lowered prices significantly contributed to the plaintiff's reduced profit margin. It ill behooves the defendant to now capitalize on the very injury which it inflicted on plaintiff by asserting that low profits indicate an absence of damage. The opposite is true.

13. Plaintiff has requested compensatory damages in the form of lost profits; i. e., those profits which the plaintiff would have made had it, rather than the defendant, sold the infringing devices. The plaintiff's per unit costs during each of the years in the accounting period have been established (PX–30). However, computation of the plaintiff's lost profits also requires determination as to the plaintiff's effective selling price. If the plaintiff's reduced selling prices are used in the computation of lost profits, the defendant would receive a substantial benefit as the result of its infringing competition with the plaintiff. The defendant would be a direct beneficiary of having forced the plaintiff to reduce its selling prices. Equity, logic and the evidence in this case require that the plaintiff's average selling price at the time that the defendant commenced the sale of its accused devices be adopted as the basis for computing plaintiff's lost profits. This determination serves three independent objectives: first, it prevents unjust enrichment of the defendant; second, it provides recognition of the exclusive patent rights granted to the plaintiff pursuant to the terms of our Constitution; and, third, it assures full compensation for the losses occasioned by defendant's acts of patent infringement.

14. Graph C in the Appendix illustrates plaintiff's lost profits on a per-unit basis (shaded area) when calculated by subtracting the plaintiff's per-unit costs from the reduced selling prices charged as a result of the defendant's infringing competition. Graph D in the Appendix illustrates the plaintiff's lost profit per unit (shaded area) when calculated on the basis of its average selling price at the time the defendant commenced its unlawful competition (PX–34.1).

15. Having determined that the plaintiff's lost profit recovery is to be based upon the original selling price of $5.45, rather than subsequently reduced selling prices, the average per unit lost profit is readily calculated by subtracting the per unit cost incurred during each of the accounting years from the plaintiff's original selling price (PX–34.3).

16. Plaintiff's lost profits for the periods subsequent to issuance of the litigated patent are calculated by multiplying the plaintiff's lost profit per unit by the number of infringing devices sold by the defendant during the corresponding period (PX–34.3):

| Accounting Period * | Plaintiff's Lost Profit Per Unit | Defendant's Unit Sales | Plaintiff's Lost Profit |
|---|---|---|---|
| 1971 | $3.13 | 18,088 | $ 56,615 |
| 1972 | 3.51 | 132,971 | 466,728 |
| 1973 | 3.96 | 171,269 | 678,255 |
| 1974 | 4.16 | 3,661 | 15,230 |

Plaintiff's total lost profit is $1,216,828.

17. Although the plaintiff has proven its lost profits and thus the basis for an award of compensatory damages, the defendants assert that plaintiff is entitled only to damages based upon an "established" or "reasonable" royalty. In support of their position the defendants have referred to an agreement between the inventor and the corporate plaintiff which provides for the assignment of patent rights in consideration for minimum royalty payments of $5,000 per month and other compensation (DX–AAA–19). At best, this agreement indicates the extent to which the inventor may have been injured through a loss of royalty income because of defendants' infringing activity. It is certainly not a measure of the losses incurred by the corporate plaintiff in its capacity as a manufacturer of the patented devices. The risks, rewards and expectations of an inventor are materially different from those of a manufacturer: The inventor seeks royalty income while the manufacturer seeks profits derived from market exclusivity. In any event, the defendants state that the payments under the agreement in question were excessive and therefore cannot be taken as the basis of a "reasonable royalty." (Defendant's Post-Trial Memorandum, p. 10). The defendant has also sought to rely on certain other agreements relating to the litigated patent. In ruling on the admissibility of these agreements, it was determined that they were made subsequent to entry of the injunction in this case and long after defendants commenced their sale of the accused devices. Furthermore, these agreements were entered into in compromise of actual disputes relating to the infringement of the litigated patent and were made only after the Service Parts' price reductions had achieved their deleterious effects in the marketplace.

\* Includes only September 1971 through January 1974

18. Service Parts urged that the plaintiff's losses were caused in large part by other manufacturers (Defendants' Post-Trial Memorandum, page 11). Whatever role was played by these "other manufacturers" cannot effect the established fact that Service Parts made and sold 325,989 infringing devices and Service Parts must now respond in damages for the injury which it has caused.

19. Pursuant to Title 35, *United States Code*, section 284, the plaintiff has requested a compensatory award including interest as fixed by the court. Essentially the plaintiff seeks compensation for delay in the form of pre-judgment interest. In this regard, it should be noted that while the damages in this case were not liquidated in a literal sense, they were, at the time they accrued, ascertainable, that is, subject to calculation. The defendant's witnesses testified that they could have calculated the defendant's per unit profits at the end of each year in the accounting period. In conjunction with the present action, the defendant was able to calculate its profits at least six years after the fact simply by referring to its financial statements and sales records (PX–31.5, DX–AAA–40 through 44). There is no indication that the defendant's variable costs (PX–31.5) differed substantially from those of the plaintiff (PX–30.4).

20. Compensation for delay is computed by multiplying the plaintiff's lost profits for each of the accounting years by the statutory rate of six percent (6%) simple (uncompounded) interest and by multiplying this figure by the number of years compensation to the plaintiff has been delayed (through April 1, 1980):

| Accounting Year | 6% of Plaintiff's Lost Profits | Years of Delay | Compensation for Delay |
|---|---|---|---|
| 1971 | $ 3,396.90 | 8.25 | $ 28,024.43 |
| 1972 | 28,003.68 | 7.25 | 203,026.68 |
| 1973 | 40,695.30 | 6.25 | 254,345.63 |
| 1974 | 913.80 | 5.25 | 4,797.45 |

The total compensation for delay to plaintiff is $490,194.19.

21. Plaintiff has requested an award of treble damages, attorney's fees, costs and disbursements under the discretionary provisions of 35 U.S.C. §§ 284 and 285. This case has already been ruled to be exceptional under these sections of the Patent Statute. For this reason and for the additional reasons set forth below, it is found that an award of treble damages, attorney's fees, costs and disbursements is both appropriate in this case and necessary to afford the plaintiff full compensation.

22. Calculation of treble damages involves multiplication of plaintiff's total lost profits ($1,216,828) by a factor of three, resulting in a treble award in the amount of $3,650,484. The amounts expended by plaintiff for attorney's fees, costs and disbursements in this action are not contested by the defendants, the total being $218,434 (PX–33.1; PTO–24 and 25, paras. 19–22). In view of the complexity and duration of this litigation, this amount is reasonable.

■ 23. The defendants' actions both before and during the course of this litigation have been "exceptional" in every sense of the word. The exceptional circumstances involved in this case have been catalogued in the record (PX–32); included are the following: (a) After learning of the plaintiff and its new product, the defendant immediately sought to secure a license under plaintiff's then pending patent application (FOF–44). During the course of confidential licensing negotiations, the plaintiff disclosed all of its technical, patent and business information to the defendant, including information relating to its newly developed radiator cap, the details of plaintiff's accumulated research, development, and experimentation, and the technical reasons underlying the successful operation of the plaintiff's devices (FOF–45). (b) Only fifty-five (55) days after conclusions of these confidential negotiations and without conducting any independent research, development or testing, the defendant entered into vigorous competition with the plaintiff, offering an identical product at a substantially reduced price (FOF–47, PX–34.1). (c)

From the outset of its production, the defendant prominently included the term "Coolant Recovery Unit" on the labels applied to cartons in which its accused devices were marketed (FOF–50). This term was confusing similar to the plaintiff's common law trademark "Coolant Recovery System" (FOF–51, COL–41), which trademark had acquired a significant or secondary meaning in the marketplace (COL–41). (d) Prior to commencement of its production, the defendant had actual notice and knowledge of plaintiff's pending patent application and usage of the plaintiff's trademark (PTO–34, para. 53, FOF–44, 45). Nonetheless, the defendant "faithfully copied" plaintiff's product (COL–38; PX–29, para. 2) and immediately commenced to market identical devices (FOF–29) under a confusingly similar trademark (FOF–50, 51; COL–41). (e) The defendant's infringing conduct was intentional, willful and in complete disregard for plaintiff's patent rights (COL–38). (f) Although the remaining defendants repeatedly denied that they infringed the litigated patent (including an express denial of infringement in the pre-trial order on liability (R–1985)), the fact remains that the phraseology used to describe their infringing devices corresponds as closely as is grammatically possible to the language of the claims in the litigated patent (COL–33). (g) The remaining defendants were fully aware of the statutory presumption of validity which attached to the litigated patent and the burden which they undertook in seeking to invalidate the patent (COL–17). The defendants had actual notice and knowledge of the Patent Office proceedings which led to the issuance of the litigated patent (R–1830, 2045). The defendants had notice of the fact that the Patent Office had already considered and rejected the principal items of prior art upon which they relied in their attempt to invalidate the patent (FOF–35, 36; COL–18, 32). The only prior patent not expressly considered by the Patent Office (Karmazin) was viewed both by this court and by the Court of Appeals as merely cumulative. (h) The defendants asserted the highly technical de-

fense of "anticipation" (35 U.S.C. § 102) even though this basis for denying patentability had already been considered and rejected by the Patent Office (COL–14; FOF–35, 36; COL–18). (i) The defendants asserted the defense of "aggregation" even though this defense had been unequivocally rejected in the Ninth Circuit (COL–21). (j) The defendants asserted that the plaintiff intentionally withheld or misrepresented material facts in securing issuance of the litigated patent; but, this assertion was found to be totally without merit (COL–32). The non-cumulative items of prior art relied upon by the defendants had either been separately cited by the Patent Office or they had been noticed to the Patent Office by the plaintiff (COL–32). (k) During the course of the liability trial, it was established that the defenses asserted by the defendants were based upon operative facts included within the Patent Office file history relating to the litigated patent (COL–32). Nonetheless, the remaining defendants chose to reassert arguments based upon these same operative facts, thereby forcing the plaintiff to undertake protracted litigation in vindication of its rights. In short, the defendants in this case have from the outset taken a completely untenable position regarding the validity of the litigated patent (COL–39). (1) The defendants have continued this course of unreasonable and oppressive behavior by forcing plaintiff to the expense of trial on the issue of damages when the extent of infringement, the magnitude of lost profits, the absence of any established royalty, and the amount of attorney's fees and costs incurred by plaintiff were all known to the defendants and not meaningfully contested by them (PTO–20 through 25, 35, 36).

24. While the defendant Service Parts has been found liable for unfairly competing with the plaintiff (R–2257), separate damages will not be assessed for this defendant's tortious acts of trade secret and trademark infringement. Rather, these acts are considered as further bases for an assessment of treble damages against this defendant.

25. It has been determined that infringement by the defendants Town and Country and Hawkes involved only sales of devices manufactured by Service Parts and that these acts of infringement were limited in extent. Accordingly, damages for patent infringement will be assessed only against the defendant Service Parts. This being the case, the defendants Town and Country and Hawkes are not affected by consideration of Service Parts' acts of unfair competition as additional grounds for an award of treble damages. The limited extent of the infringement by Town and Country and Hawkes does not alter the fact that they, together with Service Parts, asserted the same groundless defenses of non-infringement, urged the same untenable positions regarding invalidity of the litigated patent, and, forced the plaintiff to pursue ten years of litigation. Because of this, the plaintiff's attorney's fees and costs are to be assessed against the defendants jointly and severally.

In the event any of the foregoing Findings of Fact should more appropriately be considered as Conclusions of Law, they shall be so considered.

### III. CONCLUSION OF LAW

1. The plaintiffs are together possessed of the exclusive right to sue for and collect past damages for infringement of the litigated Patent No. 3,601,181. The plaintiff Walter C. Avrea is the owner of the entire right, title and interest in and to the litigated patent.

2. Title 35, *United States Code*, section 284, provides the statutory basis for an award of damages in patent cases:

"Upon finding for the claimant the court shall award the claimant *damages adequate to compensate* for the infringement, *but in no event less than a reasonable royalty* for the use made of the invention by the infringer, *together with interest and costs* as fixed by the court.

When the damages are not found by a jury, the court shall assess them. In either event *the court may increase the damages up to three times* the amount found or assessed.

The court may receive expert testimony as an aid to the determination of damages *or* of what royalty would be reasonable under the circumstances." (emphasis added)

This statute contemplates an award of compensatory damages. Provision is also made for a minimum statutory award, defined in terms of "a reasonable royalty." Damages below the hypothetical level of a "reasonable royalty" may not be properly assessed in any case, and this measure of damages is invoked only where the claimant is unable to establish the actual compensation to which it is entitled. *Yale Lock Company v. Sargent,* 117 U.S. 536, 552, 553, 6 S.Ct. 934, 942, 943, 29 L.Ed. 954 (1886); *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 505–507, 84 S.Ct. 1526, 1542–1543, 12 L.Ed.2d 457 (1964); *Faulkner v. Gibbs,* 199 F.2d 635, 638 (9th Cir. 1952); *Atlas-Pacific Engineering Co. v. Geo. W. Ashlock Co.,* 339 F.2d 288, 290 (9th Cir. 1964); *Livesay Window Co., Inc. v. Livesay Industries, Inc.,* 251 F.2d 469, 471, 472, 474, 475 (5th Cir. 1958); *Zegers v. Zegers, Inc.,* 458 F.2d 726, 730 (7th Cir. 1972); *H. K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.,* 536 F.2d 1115, 1122 (6th Cir. 1976); *Photo Electronics Corp. v. England,* 581 F.2d 772, 784 (9th Cir. 1978).

■ 3. The plaintiff has requested an award based upon its lost profits. The plaintiff does not seek, nor could this court award the profits earned by the defendant:

" 'In patent nomenclature what the infringer makes is "profits"; what the owner of the patent loses by such infringement is "damages." ' *Duplate Corp. v. Triplex Safety Glass Co.,* 298 U.S. 448–451 [56 S.Ct. 792–793, 80 L.Ed. 1274] [29 U.S.P.Q. 306, 308]. Profits and damages have traditionally been all-inclusive as the two basic elements of recovery. Prior to 1946, the statutory precursor of the present § 284 allowed recovery of both amounts, . . . By the 1946 amendment, . . . the statute was changed to approximately its present form, whereby only 'damages' are recoverable. The purpose of the change was precisely to eliminate the recovery of [the

infringer's] profits as such and allow recovery of [the patent owner's] damages only.

'The object of the bill is to make the basis of recovery in patent-infringement suits general damages, that is, any damages the complainant can prove, not less than a reasonable royalty, together with interest from the time infringement occurred, rather that profits and damages. H.R. Rep. No. 1587, 79th Cong., 2d Sess. (1946), to accompany H.R. 5311, at 1–2; S. Rep. No. 1503, 79th Cong., 2d Sess. (1946), to accompany H.R. 5311 at 2.' " *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 377 U.S. 476, 505, 506, 84 S.Ct. 1526, 1542, 12 L.Ed.2d 457 (1964)

4. The basic law of the Ninth Circuit as it relates to patent damages has been recently summarized in the *Photo Electronics* case, supra:

"The amount awardable for infringement is, therefore:

'compensation for the pecuniary loss he [the patentee] has suffered from the infringement, *without regard to the question whether the defendant has gained or lost by his unlawful acts'* . . . They have been said to constitute 'the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.' [emphasis by the court] *Aro,* 377 U.S. at 507, 84 S.Ct. at 1543, [141 U.S.P.Q. at 694].

"This court expressly followed *Aro* in *Atlas-Pacific Engineering Co. v. Geo. W. Ashlock Co.,* 339 F.2d 288, 290 (9th Cir. 1964) (reversing award of reasonable royalty damages). The Atlas-Pacific court also followed the Fifth Circuit's decision in *Livesay Window Co. v. Livesay Industries,* 251 F.2d 469 (5th Cir. 1958), which held that lost profit damages are proper '[i]f in all reasonable probability the Patent Owner would have made the sales which the Infringer has made.' Id. at 471." 581 F.2d at 784

5. In determining the *measure* by which infringement damages are to be assessed, it is necessary to first characterize the manner in which the plaintiff used its patent rights. If the plaintiff was in the business of granting royalty bearing licenses under its patent, then the damage sustained is the loss of royalty income occasioned by the defendant's infringement. If the plaintiff has chosen to manufacture the patented product and to exclude all others from doing so, then the damage sustained is the loss of profits occasioned by the defendant's infringement. In cases where the plaintiff has neither manufactured the patented product nor licensed others at an established royalty rate, the court must hypothesize "a reasonable royalty" upon which the parties would have agreed prior to commencement of the infringement. In the present case the plaintiff has established its lost profits and in so doing provided the basis for the compensatory award requested.

> "That [plaintiff's lost profit] is a proper item of damages, if proved, is clear. It is a pecuniary injury caused by the infringement, and is the subject of an award of damages, although the defendant may have made no profits and the plaintiff may have had no established license fee. As the plaintiff, at the time of the infringement, availed himself of his exclusive right by keeping his patent a monopoly, and granting no licenses, the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred, is to be measured, so far as his own sales . . . are concerned, by the difference between the money he would have realized from such sales if the infringement had not interfered with such monopoly, and the money he did not realize from such sales. If such difference can be ascertained by proper and satisfactory evidence, it is a proper measure of damages." *Yale Lock Company v. Sargent*, 117 U.S. 536, 552, 553, 6 S.Ct. 934, 942, 943, 29 L.Ed. 954 (1886).

6. The damage standards of *Yale Lock*, supra, were relied upon and reaffirmed in *Aro Mfg.*, supra, where the matter was stated quite simply:

> "[Patent damages] have been said to constitute 'the difference between his pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.' *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 552, 6 S.Ct. 934, 942, 29 L.Ed. 954. The question is 'how much had the Patent Holder and Licensee suffered by the infringement. And that question [is] primarily: had the Infringer not infringed, what would Patent Holder-Licensee have made?' *Livesay Window Co. v. Livesay Industries, Inc.*, supra, 251 F.2d at 471." *Aro Mfg. Co. v. Convertible Top replacement Co.*, 377 U.S. 476, 507, 84 S.Ct. 1526, 1543, 12 L.Ed.2d 457 (1964).

7. The propriety of an award of lost profits in a case such as the present one was addressed by the Court of Appeals in *Faulkner*, supra:

> "The infringement of a patent is a tortious taking, entitling the injured party to general damages, measured ordinarily by the fair value of what was taken, i. e., the privilege of making, using or selling the patented article . . . however . . . [where] the patentee has himself engaged in the manufacture, use or sale of his patented article, he may be awarded damages for his loss of profits resulting from the infringement." *Faulkner v. Gibbs*, 199 F.2d 635, 638 (9th Cir. 1952).

The view that a patentee-manufacturer is entitled to an award of its lost profits, rather than merely a reasonable royalty, has been frequently expressed. *Atlas-Pacific Engineering Co. v. Geo. W. Ashlock Co.*, 339 F.2d 288, 290 (9th Cir. 1964); *Marvel Specialty Co., Inc. v. Bell Hosiery Mills, Inc.*, 386 F.2d 287, 290 (4th Cir. 1967); *Zegers v. Zegers, Inc.*, 458 F.2d 726, 730 (7th Cir. 1972); *Livesay Window Co., Inc. v. Livesay Industries, Inc.*, 251 F.2d 469, 471, 472, 474, 475 (5th Cir. 1958), relied upon by the Supreme Court in *Aro Mfg. Co. v. Con-*

*vertible Top Replacement Co.*, 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964); *H. K. Porter Co., Inc. v. Goodyear Tire & Rubber Co.*, 536 F.2d 1115, 1122 (6th Cir. 1976); *Ingersoll-Rand Co. v. Brunner & Lay, Inc.*, 182 U.S.P.Q. 257, 257 (S.D.Fla.1974).

■ 8. The issue of whether plaintiff's lost profits should be reduced to account for fixed overhead expenses is by no means unique to this case. The question was expressly decided in *General Electric Co. v. Sciaky Bros., Inc.*, 415 F.2d 1068 (6th Cir. 1969):

> " '. . . [T]he question arises . . as to whether Sciaky should have charged a portion of the fixed general overhead expenses against each equivalent machine as an added expense, thereby reducing its lost profit by the amount of added expense . . . [the district court found] that the master's decision not to charge fixed expenses . . . is the correct procedure inasmuch as it compensates Sciaky for all the income which it in fact did lose as a result of the infringement, in accordance with § 284.'

> "We can, we think, be succinct in dealing with this issue. General Electric really seeks to present it as an issue of law, claiming in effect that this court should reverse the District Court . . . in its treatment of the general overhead item of expense. The record is clear that the accounting presented by Sciaky's witnesses and accepted by the master and the District Judge did include some overhead expenses, but it is also clear that general fixed overhead expenses such as officers' salaries, realty taxes, insurance, etc., were not charged to the individual sales for loss of which damages were awarded. Sciaky's expert accountant witnesses testified that these general overhead expenses were paid by Sciaky during the years in question and would not have been greater if these additional machines had been produced and sold by Sciaky. While General Electric vigorously disputes this theory, it is by no means novel in patent damage cases. See *Electric Pipe Line, Inc. v. Fluid Systems*, 250

F.2d 697, [116 U.S.P.Q. 25] (2d Cir. 1957); *Riverside Heights Orange Growers Ass'n v. Stebler*, 240 F. 703, 712–713 (9th Cir. 1917)." 415 F.2d 1068, at 1074, 1075.

The facts established in this case are consistent with the analysis set forth in *Sciaky*, supra; accordingly, it is "concluded that fixed overhead is not to be charged against plaintiff's damages." *Electric Pipe Line, Inc. v. Fluid Systems, Inc.*, 250 F.2d 697, 699 (2nd Cir. 1957). See also *W. L. Gore & Associates, Inc. v. Carlisle Corp.*, 198 U.S. P.Q. 353, 359, 366 (D.Del.1978) citing *Vitex Manufacturing Corp. v. Caribtex Corp.*, 377 F.2d 795 (3rd Cir. 1967).

■ 9. The defendants have sought to introduce certain licensing agreements entered into subsequent to the ruling on liability in this case. All of these agreements were made years after Service Parts commenced its infringement and do not comport with the rule set forth in *Rude v. Westcott*, 130 U.S. 152, 9 S.Ct. 463, 32 L.Ed. 888 (1888):

> "In order that a royalty may be accepted as a measure of damages against an infringer, who is a stranger to the license establishing it, it must be paid or secured before the infringement complained of; it must be paid by such a number of persons as to indicate a general acquiescence of its reasonableness by those who have occasion to use the invention; and it must be uniform at the places where the licenses are issued." 130 U.S. at 165, 9 S.Ct. at 468.

The decision in *Rude*, supra, has been expressly adopted in this circuit, where it has been held: "In order that a royalty may be accepted as 'established' it must have been paid prior to the infringement complained of . . .". *Faulkner v. Gibbs*, 199 F.2d 635, 638 (9th Cir. 1952). The agreements referred to by the defendants in this case "are too few in number and too late in time to establish a market price for the license as of the date of the infringements." *Dunkley Co. v. Central California Canneries*, 7 F.2d 972, 976 (9th Cir. 1925). Furthermore, these agreements were entered into in com-

promise of infringement claims against the licensed parties. Rule 408 of the Federal Rules of Evidence precludes introduction of such evidence. Long before the adoption of these rules, the Supreme Court found that such agreements could not be taken as the measure of the patent owner's damage:

"It is clear that a payment of any sum in settlement of a claim for an alleged infringement cannot be taken as a standard to measure the value of the improvements patented, in determining the damages sustained by the owners of the patent in other cases of infringement. Many considerations other than the value of the improvements patented may induce the payment in such cases. The avoidance of the risk and expense of litigation will always be a potential motive for a settlement." *Rude v. Westcott*, 130 U.S. 152, 164, 9 S.Ct. 463, 468, 32 L.Ed. 888 (1888)

This rule was sustained by the Supreme Court in *Cornely v. Marckwald*, 131 U.S. 159, 161, 9 S.Ct. 744, 745, 33 L.Ed. 117 (1888); has been followed in this circuit, *Faulkner v. Gibbs*, 199 F.2d 635, 638 (9th Cir. 1952); *Dunkley Co. v. Central California Canneries*, 7 F.2d 972, 976 (9th Cir. 1925); and in other jurisdictions, *Panduit Corp. v. Stahlin Bros. FibreWorks, Inc.*, 575 F.2d 1152, 1164 (6th Cir. 1978); *Tights, Inc. v. Kayser-Roth Corp.*, 442 F.Supp. 159, 165 (M.D.N.C.1977); *Activated Sludge, Inc. v. Sanitary District of Chicago*, 64 F.Supp. 25, 33 (N.D.Ill.1946).

■ 10. In cases such as the present one, the plaintiff's lost profits are properly based upon its average selling price *before* the defendant entered the market, rather than any reduced selling price occasioned by the defendant's unlawful competition:

"The turning-bolt was the essential feature of the Sargent lock. The defendant adopted Sargent's arrangement, and then reduced the price of the lock, forcing Sargent to do the same, in order to hold his trade . . . a reduction of prices was enforced on the plaintiff, such reduction being, in round numbers, $1 on each No. 5 lock and $2 on each No. 3 lock."

.  .  .  .  .

"Reduction of prices, and consequent loss of profits, enforced by infringing competition, is a proper ground for awarding damages. The only question is as to the character and sufficiency of the evidence, in the particular case." *Yale Lock Company v. Sargent*, 117 U.S. 536, 551, 553, 6 S.Ct. 934, 942, 943, 29 L.Ed. 954 (1886).

In assessing damages for lost profits, the defendant should not receive a benefit from having unlawfully competed with the plaintiff and thereby forcing the reduction of the plaintiff's selling price. The defendant may "not take advantage of any reduction in price caused by its own or any other infringer's wrongdoing . . ." *Overman Cushion Tire Co., Inc. v. Goodyear Tire and Rubber Co., Inc.*, 66 F.2d 361, 362 (2nd Cir. 1933). The fundamental concepts underlying an award of lost profits based upon the plaintiff's original, uneroded selling price were stated in *W. L. Gore & Associates, Inc. v. Carlisle Corp.*, 198 U.S. P.Q. 353 (D.C.Del.1978):

"During the accounting period, Plaintiff sold cable . . . at prices substantially lower than those set in the pre-infringement period. In calculating the loss due to the eroded price, the Special Master implicitly assumed that but for the unlawful competition, Gore's price would have remained constant; i. e., he assumed an infinite price elasticity of demand. . . . In the absence of evidence to the contrary, and in the absence of dispute, this Court also will adopt the elasticity assumption. The damage due to the price erosion, then, is the aggregate of the volume of each of Gore's sales during the infringement period, multiplied by the difference between the pre-infringement price and the actual sale price." 198 U.S.P.Q. at 358.

■ 11. The plaintiff has established lost profits on the basis of its average selling price in 1969, the year during which the defendant first entered the market. Throughout the period in question, plaintiff manufactured the patented devices and dis-

tributed them through nationally prominent firms. The plaintiff was the only authorized source of the patented devices. Therefore, ". . . in all reasonable probability, the Patent Owner would have made the sales which the Infringer has made, [and] what the Patent Owner . . . would have netted from the sales denied to him is the measure of his loss, and the Infringer is liable for that." *Livesay Window Co., Inc. v. Livesay Industries, Inc.*, 251 F.2d 469, 471–472 (5th Cir. 1958), relied upon by the Supreme Court in *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 84 S.Ct. 1526, 12 L.Ed.2d 457 (1964).

12. From the date the litigated patent issued, the plaintiff has complied with the marking provisions of Title 35, *United States Code*, section 287 by affixing the statutory notice to packages containing its patented devices and in so doing has "given notice to the public," including the defendants in this action. For this reason, infringement damages accrue from the date the litigated patent issued (August 24, 1971) rather than February 5, 1972 when the defendants assert they first learned of the patent (Defendants' Post-Trial Memorandum, p. 5).

13. The defendants have also claimed that they acquired "intervening rights" under plaintiff's Reissue Patent No. 27,965. (Defendants' Post-Trial Memorandum, p. 15, et seq.). However, this litigation does not even involve plaintiff's reissue patent, which was granted some months after the defendants were enjoined from infringing the litigated patent. The provisions of Title 35, *United States Code*, section 252, relied upon by defendants, apply *only* to reissued patents and the defendants have cited absolutely no authority which would expand the statute beyond its express terms. The "intervening rights" defense offered by the defendants is without factual basis, is inconsistent with the pleadings, record and prior adjudication in this case, and lacks the support of any legal authority.

14. The plaintiff is entitled to an award of lost profits in the total amount of $1,216,828. These lost profits were incurred during the following periods and in the following amounts: During September through December 1971, $56,615; during 1972, $466,728; during 1973, $678,255; and, during January, 1974, $15,230.

15. There is an increasing trend in civil litigation to award pre-judgment interest, particularly in cases involving torts against property. The basic rationale underlying these cases is that the defendant has taken something of value from the plaintiff and would be unjustly enriched if allowed to use the value taken during the pendency of the litigation without paying for that use. Analyzed in compensatory terms, it is said that the plaintiff is entitled to full compensation for the defendant's tortious taking including both the value of the property and the value of its use. See generally Dobbs, *Law of Remedies*, § 3.5 (West, 1973) and Williams, "Pre-Judgment Interest," *The Trial Lawyer's Guide* (Callaghan, 1978). Patents have "the attributes of personal property," 35 U.S.C. § 261, and the "infringement of a patent is a tortious taking," *Faulkner v. Gibbs*, 199 F.2d 635, 638 (9th Cir. 1952); accordingly, actions such as the present one fit within the developing framework of the common law. Moreover, the patent damage statute expressly provides for an award of "interest . . . as fixed by the court" 35 U.S.C. § 284. As noted in the *Aro* case, supra, Congress contemplated an award of pre-judgment interest in patent cases:

> " 'The object of the [patent statute] is to make the basis of recovery in patent-infringement suits general damages, that is, any damages the complainant can prove, not less than a reasonable royalty, *together with interest from the time infringement occurred*, rather than profits and damages.' H.R.Rep.No.1587, 79th Cong., 2d Sess. (1946), to accompany H.R. 5311, at 1–2; S.Rep.No.1503, 79th Cong., 2d Sess. (1946), to accompany H.R.5311, at 2 [U.S.Code Cong. Service 1946, p. 1387.]" 377 U.S. at 505, 506, 84 S.Ct. at 1542.

Pre-judgment interest has been frequently awarded in patent infringement cases to provide the patent owner with compensation for delay. *Corometrics Medical Systems v. Berkeley Bio-Engineering*, 193 U.S. P.Q. 467, 478 (N.D.Cal.1977); *Wahl v. Carrier Mfg. Co., Inc.*, 511 F.2d 209, 214, 215 (7th Cir. 1975); *Abbott v. Barrentine Mfg. Co., Inc.*, 160 U.S.P.Q. 524, 527 (N.D.Miss.1968); *Marvel Specialty Co., Inc. v. Bell Hosiery Mills, Inc.*, 386 F.2d 287, 290 (4th Cir. 1967); *Bartlett v. Winton*, 150 U.S.P.Q. 227 (M.D. Fla.1966); *Geo. W. Ashlock v. Atlas-Pacific Engineering Co., Inc.*, 225 F.Supp. 205, 221 (N.D.Cal.1963), modified on other grounds, 339 F.2d 288 (9th Cir. 1964); *Union Carbide Corp. v. Graver Tank & Mfg. Co., Inc.*, 282 F.2d 653, 676, 677 (7th Cir. 1960) (setting forth the 7th Cir. rule on interest but reversing holding on exceptional circumstances); *Mathey v. United Shoe Machinery Corp.*, 54 F.Supp. 694, 701 (D.Mass.1944); *Swan Carburetor Co. v. Nash Motors Co.*, 133 F.2d 562, 567 (4th Cir. 1943).

16. The general approach taken by Judge Lindberg in *Brian Jackson Associates v. San Manuel Copper Corp.*, 305 F.Supp. 66 (D.Ariz.1969) is adopted in the present case where the "court fixes the interest rate at 6% simple interest as of the end of each calendar year during the period of infringement." 305 F.Supp. at 74. A multiple award of interest will not be allowed and, unlike the *Brian Jackson* case, supra, interest will not be based on multiple damages. The plaintiff is entitled to an award in the amount of $490,194.19 as compensation for delay.

17. This is an exceptional case with respect to the defendant Service Parts in view of its faithful copying of plaintiff's invention, its willful infringement of plaintiff's patent, its complete disregard for plaintiff's patent rights, its breach of a confidential relationship with the plaintiff, its misappropriation and unauthorized use of plaintiff's trade secrets, and its unlawful adoption and use of a term confusingly similar to plaintiff's common law trademark. The plaintiff is entitled to and shall be awarded treble damages in the amount of $3,650,484, 35 U.S.C. § 284. This sum shall be assessed only against the defendant Service Parts.

18. This is an exceptional case with respect to all of the defendants in view of their joint assertion of totally untenable positions with respect to the infringement, validity and enforceability of plaintiff's patent. The plaintiff is entitled to and shall be awarded its attorney's fees, costs and disbursements incurred in prosecuting this action through March 4, 1980, said award being in the amount of $218,434.41, 35 U.S.C. §§ 284, 285; *Livesay Window Co. v. Livesay Industries, Inc.*, 251 F.2d 469, 475, 476 (5th Cir. 1958). Attorney's fees, costs and disbursements shall be assessed against each of the remaining defendants, jointly and severally. *Krieger v. Colby*, 106 F.Supp. 124, 131, 132 (S.D.Cal.1952). An observation in *Warren v. White & Wychoff Mfg. Co.*, 39 F.2d 922 (D.C.1930), a copyright case wherein attorney's fees were awarded, has equal application here:

> ". . . plaintiff has found it necessary to institute this suit to bring the defendant to book, and it seems to me that, the defendant having led the plaintiff a dance over the matter, it, and not the plaintiff, ought to be made to pay the fiddlers and the scot." 39 F.2d at 923.

19. The foregoing assessment of treble damages, attorney's fees, and costs and disbursements are within the statutory bounds of discretionary authority set forth in 35 U.S.C. §§ 284 and 285, they are dictated by the facts in this case, they are required for adequate compensation of the plaintiff and they are supported by substantial precedent. *Coleman Co., Inc. v. Holly Mfg. Co.*, 269 F.2d 660, 661, 662, 666, 667 (9th Cir. 1959); *Radiator Specialty Co. v. Micek*, 327 F.2d 554, 556 (9th Cir. 1964), cert. den. 379 U.S. 821, 85 S.Ct. 41, 13 L.Ed.2d 31 (1965); *Brian Jackson Associates v. San Manuel Copper Corp.*, 305 F.Supp. 66, 68, 73 (D.Ariz. 1969); *Corometrics Medical Systems v. Berkeley Bio-Engineering*, 193 U.S.P.Q. 467, 472, 478 (N.D.Cal.1977); *Solex Laboratories v. Graham*, 165 F.Supp. 428, 437 (S.D.Cal. 1958); *American Safety Table Co. v.*

*Schreiber*, 415 F.2d 373, 378, 380 (2nd Cir. 1969); *Livesay Window Co. v. Livesay Industries, Inc.*, 251 F.2d 469, 475, 476 (5th Cir. 1958); *Hartford National Bank v. E. F. Drew & Co., Inc.*, 188 F.Supp. 353, 356, 357, 363 (D.Del.1960); *aff'd* 290 F.2d 589 (3rd Cir. 1961), *cert. den.* 368 U.S. 825, 82 S.Ct. 45, 7 L.Ed.2d 29, 131 U.S.P.Q. 498 (1961).

■ 20. Two of the former defendants in this action, Balkamp, Inc. and Genuine Parts Company, sold infringing devices which were manufactured by Service Parts. On February 13, 1980, this court entered a stipulated judgment against these two defendants, assessing damages in the amount of $200,000 in conjunction with their infringing sales. In situations of this type where one defendant has manufactured and another has sold infringing devices, they both have contributed toward the infringement and are treated as joint tortfeasors: the release of one does not release the other unless the plaintiff has been fully compensated for the infringement contributed to by both. This rule was adopted by the Supreme Court in *Aro*, supra:

> "It is true that a contributory infringer is a species of joint-tortfeasor, who is held liable because he has contributed with another to the causing of a single harm to the plaintiff. See *Wallace v. Holmes*, 29 Fed.Cas. 74, 80 (No. 17,100) (C.C.D.Conn. 1871); *Thomson-Houston Elec. Co. v. Ohio Brass Co.*, supra, 80 F. 712, at 721 (C.C.A.); Rich, 21 Geo.Wash.L.Rev. 521, 525 (1953). It is also true that under the old common-law rule, a release given to one joint-tortfeasor necessarily released another, even though it expressly stated that it would have no such effect. See Prosser, Torts (2d ed. 1955), at 243–244. Under this rule Aro's argument on this point would prevail, since the agreement did release Ford's purchasers for their infringing use of the top-structures before the agreement date, and that was the use to which Aro contributed. See *Schiff v. Hammond Clock Co.*, 69 F.2d 742, 746, [21 U.S.P.Q. 308, 311–312] (C.A. 7th Cir. 1934), reversed for dismissal as moot, 293 U.S. 529, [55 S.Ct. 146, 79 L.Ed.

639]. But the rule is not applicable. Even in the area of nonpatent torts, it has been repudiated by statute or decision in many if not most States, see Prosser, supra, at 245, and by the overwhelming weight of scholarly authority. E. g., American Law Institute, Restatement of Torts (1939), § 885(1) and Comments b–d. And application of the rule to contributory infringement has been rejected by this Court. In *Birdsell v. Shaliol* supra, 112 U.S. [485], at 489 [5 S.Ct. 244, 28 L.Ed. 768], the Court applied to a patent case the proposition that 'By our law, judgment against one joint trespasser, without full satisfaction, is no bar to suit against another for the same trespass.' What is true of a judgment is true of a release. See Prosser, supra, at 241–244. A release given a direct infringer in respect of past infringement, which clearly intends to save the releasor's rights against a past contributory infringer, does not automatically surrender those rights. Thus, the District Court was correct in denying that 'defendants are entitled to the fortuitous benefit of the old joint-tortfeasor rule.' The mere fact that the agreement released Ford and Ford's customers for their past infringement does not negate Aro's liability for its past infringement.

> .    .    .    .    .

> The rule is that

> 'Payments made by one tortfeasor on account of a harm for which he and another are each liable, diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment. * * *' Restatement of Torts, supra, § 885(3).

It has been said that 'all courts are agreed' upon such a rule. Prosser, supra, at 246. And its applicability to contributory-infringement cases has been clearly indicated by this Court. *Birdsell v. Shaliol*, supra, 112 U.S., at 488–489 [5 S.Ct., at 245–246;] see *Hazeltine Corp. v. Atwater Kent Mfg. Co.*, supra 34 F.2d 50, 52 (D.C. E.C.Pa.1929)." 377 U.S. at 500, 501, 503, 84 S.Ct. at 1539–1541.

A similar analysis was earlier set forth in *Wilson v. Union Tool Co.*, 265 F. 669 (9th Cir. 1920). On the basis of the foregoing authority, the plaintiff's claim for patent infringement is diminished to the extent that it has been compensated by the $200,-000 judgment entered against Balkamp, Inc. and Genuine Parts Company.

21. Damages are assessed solely against the defendant Service Parts, Inc. in accord with the following schedule:

Treble damages for patent infringement __$3,650,484
Interest from the time of infringement ___$ 490,194
Less Balkamp/Genuine contribution _____$ 200,000
        Total _____$4,120,678

22. Damages are assessed against all of the remaining defendants, Service Parts, Town and Country and Hawkes, jointly and severally, in the amount of $218,434.41, which sum is awarded as compensation for plaintiff's attorney's fees, costs and disbursements incurred in prosecuting this action.

23. In cases such as the present one, it must be remembered that we are dealing with rights which are created and protected under an express Constitutional provision, Article I, paragraph 8, clause 8. As is true of so many other Constitutional rights, those granted to an inventor are extremely fragile and are subject to easy abuse by those who choose to disregard them. It is for this reason that Congress has enacted damage statutes giving the district courts broad discretion in fashioning the patentee's remedy to fit the wrong. As Judge Winner recently noted in adopting conclusions from the liability decision in the present case: "Commercial piracy can be profitable and it can be expensive to the buccaneer. This case comes down on the expensive side. I agree with and adopt the language of *Saf-Gard Products, Inc. v. Service Parts, Inc.* (1974) D.C.Ariz., 370 F.Supp. 257 . . ." *Lam, Inc. v. Johns-Manville Corp.*, (D.C.Col., September 19, 1979).

In the event any of the foregoing Conclusions of Law should more appropriately be considered Findings of Fact, they shall be so considered.

## APPENDIX

GRAPH A:   PLAINTIFF'S LOSS OF
           MARKET SHARE

Plaintiff's Average Selling Price
-------------Defendant's Average Selling Price

GRAPH B:   FORCED REDUCTION OF
           PLAINTIFF'S SELLING PRICE

GRAPH C:   PLAINTIFF'S LOST PROFITS BASED UPON
           FORCED REDUCTION IN SELLING PRICE

GRAPH D: PLAINTIFF'S LOST PROFITS BASED UPON
PRE-COMPETITION SELLING PRICE